2021 IL App (1st) 210318-U

Nos. 1-21-0318 & 1-21-0344 (cons.)

Order filed December 2, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN THE INTEREST OF T.P. and S.P., | ) ) | Appeal from the Circuit Court of |
| Minors-Respondents-Appellees, | ) ) | Cook County, Illinois Juvenile Justice and |
| (The People of the State of Illinois, | ) ) | Child Protection Department, Child |
| Petitioner-Appellee, | ) ) | Protection Division |
| v. | ) ) | |
| Rogelio P., | ) | Nos. 19 JA 235-36 |
| Father-Respondent-Appellant, | ) ) | |
| and | ) ) | |
| Sarah P., | ) | Honorable |
| Mother-Respondent-Appellant.) | ) ) | Peter Vilkelis, Judge Presiding. |

JUSTICE MARTIN delivered the judgment of the court.
Presiding Justice Reyes and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's adjudicatory and dispositional findings were not against the manifest weight of the evidence.

¶ 2    This appeal involves challenges to the trial court's adjudicatory and dispositional orders

arising out of proceedings under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq*. (West 2018)). Respondents, Sarah P. (Sarah) and Rogelio P. (Rogelio) (collectively, parents), are the natural parents of minor children S.P. (girl) and T.P. (boy). The minors are fraternal twins born August 23, 2013.

¶ 3       At five years of age, S.P. gave an out-of-court statement to a forensic interviewer indicating she had been sexually abused by Rogelio. The Illinois Department of Children and Family Services (DCFS) took temporary protective custody of the minors after Sarah failed to comply with the terms of a safety plan and allowed Rogelio back into the family home.

¶ 4       On December 1, 2020, following an adjudicatory hearing, the trial court entered an order finding S.P. to be abused and neglected based on lack of care, injurious environment, substantial risk of physical injury, and sexual abuse pursuant to applicable sections of the Juvenile Court Act. See 705 ILCS 405/2-3(1)(a) (lack of care), (1)(b) (injurious environment), (2)(ii) (substantial risk of physical injury), and 2(iii) (sexual abuse) (West 2018). The court's findings were based on its determination that S.P.'s hearsay statements of sexual abuse were sufficiently corroborated, and that Sarah had failed to abide by the terms of the safety plan and service recommendations of DCFS. On the same date, the court also entered an adjudicatory order finding T.P. to be abused and neglected based on injurious environment and substantial risk of physical injury. This finding was based on the same evidence used to support the finding of abuse and neglect of S.P.

¶ 5       On February 25, 2021, following a dispositional hearing, the trial court entered an order finding Rogelio unfit and unable for some reason other than financial circumstances alone to care for, protect, train, or discipline his minor children. On the same date, the court entered a dispositional order finding Sarah unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minors. The court determined that it was in the minors'

best interests to remove them from the parents' custody and the court placed them under guardianship with DCFS.

¶ 6    The parents separately appeal from the adjudicatory and dispositional orders. They argue that the trial court's adjudicatory and dispositional findings were against the manifest weight of the evidence. The appeals were consolidated for review. For the reasons which follow, we affirm.[1]

¶ 7                                I. BACKGROUND

¶ 8                           A. Adjudicatory Hearing

¶ 9    The following testimony and evidence were presented at the adjudicatory hearing.

¶ 10                           1. Events at the Family Home

¶ 11    On January 9, 2019, Sarah overheard S.P. tell T.P. to "sit with his hands behind his back" and to "do it right or I'm not going to give you candy." When Sarah looked in on the children, she observed S.P. laying on top of T.P., with their pelvises touching. Sarah asked S.P. where she learned this behavior and S.P. replied "the video." Sarah asked S.P. "what were they doing in the video?" When S.P. did not respond, Sarah asked her "did someone do that to you?" When asked again, S.P. whispered "papi did it."

¶ 12    Sarah asked S.P. did it hurt, to which S.P. responded, "in her belly button and foot." Sarah then asked S.P. if it "hurt here?" pointing to her shoulder, knee, and other body parts, including her vagina, which Sarah referred to as the "private area." S.P. responded "no." Sarah asked S.P., "how did this happen?" S.P. responded "he squished me like a sandwich; he told me not to tell you and he would give me ice cream."

¶ 13    Sarah asked S.P. to demonstrate. S.P. laid on top of her mother for "a second" and then got

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon entry of a separate written order.

up. When Sarah asked S.P. how many times this happened, S.P. responded that it happened one time when she was in Ms. Camacho's class. Ms. Camacho was S.P.'s preschool teacher the previous year.

¶ 14    Sarah confronted Rogelio with S.P.'s statements. Rogelio denied doing anything and stated that S.P. was making it up.

¶ 15    Sarah contacted S.P.'s speech language pathologist (SLP) at Lurie Children's Hospital and voiced her concerns over what S.P. had told her. The SLP contacted a nurse at the hospital who advised the SLP to ask Sarah to bring S.P. to the emergency department to be examined.

¶ 16                                2. Hospital Emergency Department

¶ 17    On January 10, 2019, Sarah brought S.P. to the emergency department at Lurie Children's Hospital to be evaluated for signs of possible sexual abuse. Sarah was interviewed by a nurse and a licensed clinical social worker. Sarah reported having severe anxiety and depression based on fears that someone would harm her children. Sarah reported that the anxiety and depression improved once her children began to speak. Sarah stated that she intermittently checks S.P.'s genital area and that she never noticed any injuries or blood in S.P.'s underwear. Sarah stated that S.P. and Rogelio had a loving relationship and that S.P. was not afraid of her father. Sarah reported that Rogelio had denied sexually abusing S.P.

¶ 18    The social worker's progress report noted that Sarah shared that on one occasion while her sister was babysitting the children, the sister streamed a movie on the family's laptop computer. When Sarah and Rogelio returned home, Rogelio opened the laptop and a porn advertisement appeared on the screen. Sarah claimed the children denied seeing the advertisement or any other images on the computer. Sarah also reported that S.P. sometimes does "weird stuff" such as trying to kiss her brother or saying that she wanted to marry him one day. Sarah stated it was "normal"

4

to see S.P. and her brother "rough housing with each other."

¶ 19    Sarah refused to have S.P. undergo a sexual assault evidence collection kit, but she consented to have S.P. undergo a physical exam and testing for sexually transmitted infections (STIs). No signs of sexual abuse were found in the physical exam. However, S.P.'s medical record noted that a normal "exam does not prove or disprove sexual abuse/assault even if vaginal and/or rectal penetrating trauma did occur."

¶ 20    The social worker informed Sarah that as a mandated reporter, the social worker was required to report the allegations of suspected child sexual abuse to DCFS and the police. The social worker noted that Sarah "became very anxious and upset" and expressed her belief that "nothing happened" to her daughter. Sarah stated, "you're not going to find anything" and "I just want to do the medical interview first to see if this is true before we do all this stuff."

¶ 21                           3. Matter Comes to the Attention of DCFS

¶ 22    On January 11, 2019, Scott Peterson, a child protection investigator with DCFS, met with Sarah. Mr. Peterson interviewed Sarah and created a safety plan based on suspected child sexual abuse. Under the safety plan, Sarah agreed to ensure that Rogelio had no contact with either S.P. or T.P. during the DCFS investigation. The safety plan noted that Sarah was responsible for ensuring the safety of the children. The safety plan specified that an assigned primary DCFS investigator would determine when to terminate the plan. The safety plan would remain in place for five days and would be reevaluated by the assigned investigator. Mr. Peterson attested that he discussed the safety plan with Sarah and the consequences if she failed to comply with the terms of the plan. Sarah agreed to and signed the safety plan.

¶ 23    On January 14, 2019, Elisa Corona, a child protection investigator with DCFS, was assigned to investigate the allegations of child sexual abuse. Ms. Corona spoke with Sarah by

telephone and explained the DCFS investigation process. Sarah informed Ms. Corona that she had been with Rogelio for eight years. Sarah stated that Rogelio was out of the family home and currently living with his mother.

¶ 24                                    4. The Victim-Sensitive Interview

¶ 25    On January 22, 2019, Sarah brought S.P. to the Children's Advocacy Center (CAC) for a victim-sensitive interview (VSI) with a forensic interviewer. At the time of the interview, S.P. was five years old. Ms. Corona observed the interview in person.

¶ 26    S.P. told the interviewer that she lived with her mother, father, and brother. During the forensic interview, S.P. told the interviewer that one day her dad jumped on her. S.P. said that her mother and brother were not there, only her dad. S.P. said that her dad was "jumping on top of me with his hand. On my bed." "He climbed on top of me and said ssshhh and … He jumped on top of me. How come he said that? I don't know."

¶ 27    The interviewer asked S.P. which body parts of her dad's body she felt. S.P. responded "Weewee, foot, leg, knee, leg, foot, head, eyes, lips, nose, ears, shoulders, arms, hands, back, neck, belly, tummy, lung, and butt." The interviewer asked S.P. where she felt her dad's "weewee." S.P. pointed to her vaginal area and called it "weewee." S.P. said her dad's "weewee" felt "ticklish. Cold." When the interviewer asked S.P. what her dad's body was doing when she saw his "weewee" she responded "jiggling." When asked to demonstrate, S.P. moved her hips back and forth quickly while sitting.

¶ 28    The interviewer asked S.P. if she could see her dad's "weewee" when he jumped on top of her. S.P. responded "No. But his pant almost come down. It was a butt crack." The interviewer asked if the dad's pants stayed, moved, or something else. S.P. responded that they moved and then moved her hand halfway down her hip. The interviewer asked, "then what happened?" S.P.

responded, "and then I covered up my eyes because I didn't want to see that weewee."

¶ 29    The interviewer asked S.P. what the dad did with his "weewee." S.P. said "he pulled up his pants." S.P. said, "And then what happened. And then I told him stop." In a high-pitched tone, S.P. said "Stop it. Then he stopped when I told him. I had to tell him two times, I mean three times." The interviewer asked S.P. if she told her dad that she was going to tell her mother. S.P. answered in a whispered voice, "Yea. He said 'ssshhh be quiet.' " S.P. gestured her index finger to her mouth. S.P. said this happened when she was four years old, and her mother was at work.

¶ 30    The interviewer asked S.P. which part of her weewee felt her dad's weewee, "the sides, the line, or the hole?" S.P. pointed to her vaginal area and stated, "the sides." S.P. said "I did have underwear. But it was coming off. They were shhhlipping off. Those underwear was pretty wet. Because papa put them in water." The interviewer asked S.P. where on her body she felt her dad's weewee. S.P. responded "on the sides of my weewee on the skin."

¶ 31    After observing the victim-sensitive interview and being debriefed by the interviewer, Ms. Corona spoke with Sarah and informed her about what S.P. disclosed in the interview. Ms. Corona told Sarah that the safety plan was to remain in place and Sarah agreed. Ms. Corona also instructed Sarah not to discuss the victim-sensitive interview with S.P. or Rogelio.

¶ 32    Ms. Corona spoke with Rogelio by telephone after the victim-sensitive interview. Ms. Corona informed Rogelio that the investigation was ongoing, the safety plan was still in place, and he could not return home. Rogelio agreed.

¶ 33    At the conclusion of the victim-sensitive interview, Yolanda Temblador, a family advocate at the CAC, spoke with Sarah in person at the center. Ms. Temblador offered to put Sarah and her children on a waiting list to obtain mental health services at the center. Sarah was not sure about receiving mental health services at the center and stated that she would probably follow up with

her own provider. Ms. Temblador told Sarah that she did not have to decide at that moment and informed Sarah that she would give her a call later to see what she decided to do.

¶ 34    Ms. Temblador placed telephone calls to Sarah three times from January to February of 2019, and each time she received a message that the phone number was not in service. After failing to reach Sarah by telephone, Ms. Temblador mailed her a letter explaining that she was trying to contact her. Sarah did not respond to the letter and she and her children never received mental health services at the center. Ms. Temblador closed the case due to no response.

¶ 35                    5. Return to Hospital for Follow-up Visit

¶ 36    Sarah brought S.P. to Lurie Children's Hospital on February 6, 2019, for a follow-up appointment. Sarah spoke with a social worker and reported that S.P. was doing fine. Sarah stated that Rogelio was not living at home, and he had no contact with S.P., but that S.P. had asked to see her father. Sarah told the children that their father was away at work.

¶ 37    Sarah stated that she did not understand why it was necessary to bring S.P. to the hospital for a follow-up visit. Sarah expressed concern that her frequent questioning of S.P. may have had a negative impact on S.P. and led her to make an inaccurate disclosure. Sarah stated that she did not believe the interaction she observed between S.P. and T.P. was sexual in nature. Sarah became tearful and stated, "[t]his is my worst nightmare. I don't know what to believe, my husband would never hurt our kids. My father is very sick in Mexico and this is so much to deal with right now."

¶ 38    On February 8, 2019, Ms. Corona returned a telephone call from Sarah. Sarah stated that she was still struggling with S.P.'s disclosure; she believed that something happened to S.P., but "it didn't make sense to her." Ms. Corona discussed family preservation services and counseling for the entire family. Sarah agreed to engage in the services.

¶ 39    Sarah also asked about a family trip to Mexico, which she was considering canceling. Ms.

Corona told Sarah that she and her children could travel to Mexico, provided Rogelio did not go with them. Sarah agreed that Rogelio would not accompany the family on the trip to Mexico. Sarah stated that she would call Ms. Corona when she returned from Mexico so that she and her family could engage in family preservation services.

¶ 40          6. DCFS Takes Temporary Protective Custody of the Children

¶ 41    On March 12, 2019, Ms. Corona went to the children's school to see if they had returned from Mexico and for a well-being check so that she could initiate family preservation services. Ms. Corona spoke with each child individually. She first spoke with T.P., who stated that he lived with his mother, father, and sister. T.P. told Ms. Corona that his father came back Tuesday.

¶ 42    S.P. told Ms. Corona that she lived with her mother, father, and brother. S.P. said that her mother or father would take her to school, and that her uncle or grandparents would pick her up from school. Ms. Corona asked S.P. if her dad went with the family to Mexico. S.P. initially said "yes," but then said her father went to Mexico when she was a baby and in pre-K but did not go this time.

¶ 43    After speaking with the children, Ms. Corona called her supervisor and then called Sarah. Ms. Corona told Sarah what the children had reported and informed Sarah that she was waiting for approval to take protective custody of the children. Ms. Corona asked Sarah if there were any relatives who could care for the children. Sarah yelled at Ms. Corona and stated that more than 60 days had passed since the investigation and that nothing had happened to S.P. Sarah stated that she had confronted S.P. about her disclosures, and that S.P. had denied making the disclosures.

¶ 44    About 15 to 20 minutes after the telephone conversation, Sarah arrived at the children's school. Sarah attempted to take the children home with her, causing Ms. Corona to put the children in the assistant principal's office. Sarah yelled that nothing happened to S.P. and tried to get S.P.

to unlock the office door. Ms. Corona took protective custody of the children. The children were placed with their maternal grandparents.

¶ 45    Ms. Corona indicated[2] Rogelio for sexual penetration to S.P. and substantial risk of sexual abuse to T.P. based on the disclosures S.P. made in her victim-sensitive interview. The final findings of the DCFS investigation were entered on March 20, 2019, and the investigation was closed.

¶ 46                    7. Motion for Directed Finding and Motion to Reconsider

¶ 47    At the close of the State's and guardian *ad litem*'s evidence, counsel for Rogelio moved for a directed finding as to the allegation of sexual abuse. Counsel argued that the State had failed to prove by a preponderance of the evidence that S.P. was a victim of sexual abuse. Counsel argued that S.P.'s out-of-court statements of sexual abuse were not subject to cross-examination and that the State had failed to present evidence to corroborate the statements. The motion for the directed finding was joined by Sarah's counsel.

¶ 48    After hearing arguments on the motion, the trial court granted the motion as to the allegation of sexual abuse of S.P. The court determined that S.P.'s out-of-court statements of sexual abuse were not sufficiently corroborated to support a finding of sexual abuse. The court based its ruling on section 2-18(4)(c) of the Juvenile Court Act, which provides that a minor's prior statements of abuse or neglect, if uncorroborated and not subject to cross-examination, are not sufficient to support a finding of abuse or neglect. 705 ILCS 405/2-18(4)(c) (West 2018). The court made clear that the only thing it was dismissing was the allegation of sexual abuse and that "the allegations of neglect care necessary, and neglect, injurious environment, abuse substantial risk are still in existence." The adjudicatory hearing was continued. The State subsequently filed

---

[2]"An 'indicated' report means that there is credible evidence that the alleged abuse or neglect exists." *Stull v. Department of Children and Family Services*, 239 Ill. App. 3d 325, 328 (1992).

a motion to reconsider the court's directed finding in favor of the parents as to the allegation of sexual abuse.

¶ 49    At the next hearing, the State argued its motion to reconsider, asking the court to reconsider its finding as to the allegation of sexual abuse. In support of its motion, the State cited *In re A.P.*, 179 Ill. 184 (1997), where the Illinois Supreme Court discussed the evidence necessary to corroborate a minor's out-of-court statement of sexual abuse. The Supreme Court stated that "[i]n essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected. The form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence." *Id*. at 199.

¶ 50    The State argued that there were two sets of corroborating evidence to support S.P.'s out-of-court statements of sexual abuse: (1) S.P.'s sexualized behavior with her brother T.P., where she was "essentially reenacting the sexual abuse that she experienced by her father;" and (2) S.P.'s description of sexual matters in a manner that was beyond the knowledge of a typical five-year-old. The guardian *ad litem* joined in the State's argument.

¶ 51    In opposition, counsel for Sarah argued that in granting the motion for the directed finding, the court "considered exactly the kinds of things that the State is talking about right now" and determined there was insufficient evidence to corroborate S.P.'s statements of sexual abuse. Counsel for Rogelio agreed and added that S.P.'s medical records did not corroborate sexual abuse.

¶ 52    After hearing arguments on the motion, the trial court granted the State's motion to reconsider and denied the motion for a directed finding as to the allegation of sexual abuse. The trial court stated that when it granted the motion for a directed finding it only considered S.P.'s statements and had failed to consider her sexualized behavior toward her brother or her level of sexual knowledge beyond what a "normal five year old would know." The trial court continued

the adjudicatory hearing. The hearing was subsequently continued several times due to the COVID-19 pandemic.

¶ 53    At the final adjudicatory hearing, counsels for the parents rested and the trial court heard closing arguments. The State asked the court to find that S.P. was sexually abused and that she was neglected by failing to receive the necessary care. The State also requested the court to find that both children were subjected to an injurious environment and placed at substantial risk of injury. The guardian *ad litem* adopted the State's arguments. Counsels for the parents argued that there was insufficient evidence to corroborate S.P.'s statements of sexual abuse.

¶ 54    After hearing argument from counsels, the trial court found that the State had met its burden of proof as to all allegations in the petitions. The court found that S.P. was sexually abused and that her statements of sexual abuse were sufficiently corroborated. The court named Rogelio as the perpetrator of the sexual abuse. The court also found that Sarah had failed to abide by the terms of the safety plan and service recommendations of DCFS. The court found S.P. and T.P. abused and neglected based on an injurious environment and substantial risk of physical injury. The matter was continued for the dispositional hearing.

¶ 55                              B. Dispositional Hearing

¶ 56    The dispositional hearing was conducted via Zoom video conference. The hearing addressed the issues of family reunification services previously provided to the parents and children and visitation. The following evidence was presented at the hearing.

¶ 57    Sarah and Rogelio were currently living together in the family home. The children were currently living with their maternal grandparents.

¶ 58    Each of the children had been successfully discharged from individual therapy and there were no further recommendations for services. Counsel for Sarah presented evidence that S.P.'s

therapist noted that during S.P.'s therapy sessions, she never disclosed or exhibited behavior that would indicate she had been sexually abused. The trial court then asked whether the therapist had ever seen S.P.'s victim-sensitive interview. The response was "no."

¶ 59    Sarah was engaged in therapy; she felt that the DCFS case was her fault. Sarah had completed parenting classes. The integrated assessment for Sarah recommended child-parent psychotherapy but noted that this service could not be put into place until Sarah acknowledged that Rogelio had sexually abused her daughter.

¶ 60    Rogelio had competed parenting classes. Rogelio had also completed individual therapy, but it was recommended that he continue individual therapy once he completed a sex offender evaluation. Rogelio was currently on the waiting list for sex offender and substance abuse services. Rogelio continued to deny that he sexually abused his daughter and expressed reluctance to engage in sex offender services.

¶ 61    In regard to visitation, the trial court became disturbed after a service provider testified that her agency had allowed the maternal grandparents to supervise visitation between the children and their father. The court noted that there was a visitation order specifying that the agency was to supervise the visits. The court entered a no-contact order between Rogelio and S.P. The court clarified that visits between a sex abuse perpetrator and child victim should be supervised by the agency and not the foster parents. The court stated that the no-contact order would remain in effect until Rogelio completed a sex offender evaluation and the court received a recommendation from S.P.'s therapist that it would be clinically appropriate for there to be contact between S.P. and her father.

¶ 62    The trial court adjudged the children wards of the court based on the best interest and welfare of the children and the public. The court found Sarah unable for some reason other than

13

financial circumstances alone to care for, protect, train, or discipline the minors. The court found Rogelio unfit and unable for some reason other than financial circumstances alone to care for, protect, train, or discipline his minor children.

¶ 63    The trial court determined that reasonable efforts were made by the agency to prevent or eliminate the need to remove the minors from the home. However, the services aimed at family preservation and reunification had been unsuccessful. The court determined that it was in the minors' best interests to remove them from the parents' custody and the court placed them under guardianship with DCFS. This appeal followed.

¶ 64                                                    II. ANALYSIS

¶ 65    The Juvenile Court Act sets forth a step-by-step process courts use to decide whether a minor child should be removed from his or her parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship is filed by the State and the minor is placed in temporary custody, the trial court must make a finding that the child is abused, neglected, or dependent before it conducts an adjudication of wardship. 705 ILCS 405/2-21 (West 2018); *Id.* In making that finding, the rules of evidence in the nature of civil proceedings apply. *In re A.W.*, 231 Ill. 2d 241, 256 (2008). If the court finds that the minor is abused, neglected, or dependent, it then conducts a dispositional hearing to determine whether the minor should be made a ward of the court. *In re Faith B.*, 216 Ill. 2d 1, 14 (2005); *In re Jay H.*, 395 Ill. App. 3d 1063, 1068 (2009).

¶ 66                                              A. Adjudicatory Order

¶ 67    The first issue on appeal concerns the propriety of the trial court's adjudicatory order. As mentioned, the trial court must make a finding that the minor child is abused, neglected, or dependent before it conducts an adjudication of wardship. *In re Arthur H.*, 212 Ill. 2d at 462.

¶ 68    Cases involving allegations of abuse and neglect are *sui generis* and must be decided based upon their unique facts. *Id*. at 463. The State has the burden of proving allegations of abuse, neglect, or dependency by a preponderance of the evidence. *In re Faith B*., 216 Ill. 2d at 13.

¶ 69    A neglected minor includes any minor under 18 years of age who is not receiving "care necessary for his or her well-being" or "whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(a), (b) (West 2020). "[N]eglect is defined as the failure to exercise the care that circumstances justly demand" and "embraces both willful and unintentional disregard of parental duty." (Internal citations and quotation marks omitted.) *In re Arthur H*., 212 Ill. 2d at 463. The phrase "injurious environment has been recognized by our courts as an amorphous concept that cannot be defined with particularity," but is generally "interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for his or her children." (Internal citations and quotation marks omitted.) *Id*.

¶ 70    The Juvenile Court Act provides that an abused minor includes any minor under 18 years of age whose parent "commits or allows to be committed any sex offense against such minor, as sex offenses are defined in the Criminal Code of 1961 or the Criminal Code of 2012, or the Wrongs to Children Act." 705 ILCS 405/2-3(2)(iii) (West 2020).

¶ 71    On review, a trial court's finding of abuse, neglect, or dependency will not be reversed unless it is against the manifest weight of the evidence. *In re Faith B*., 216 Ill. 2d at 13-14; *In re Arthur H*., 212 Ill. 2d at 464. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *In re Faith B*., 216 Ill. 2d at 13-14; *In re Arthur H*., 212 Ill. 2d at 464.

¶ 72    The parents argue that the trial court's adjudicatory findings of abuse and neglect were against the manifest weight of the evidence. Specifically, the parents contend that the court erred

in finding that their children were abused and neglected based on S.P.'s allegations of sexual abuse because her out-of-court statements of sexual abuse were not sufficiently corroborated to support a finding of sexual abuse by Rogelio.

¶ 73    Section 2-18(4)(c) of the Juvenile Court Act "creates an exception to the general rule against hearsay and allows a minor's out-of-court statements relating to allegations of abuse or neglect to be admitted into evidence at a civil adjudicatory hearing to determine whether the minor is abused or neglected*." In re An.W.*, 2014 IL App (3d) 130526, ¶ 61. This section of the Juvenile Court Act provides that a minor's hearsay statement is sufficient to support a finding of abuse or neglect where the statement is either subject to cross-examination or is corroborated by other evidence. *In re A.P.*, 179 Ill. 2d 184, 196 (1997).

¶ 74    In the context of section 2-18(4)(c) of the Juvenile Court Act, corroborating evidence is "independent evidence of the abuse or neglect which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *Id*. at 199. "[C]orroborating evidence is evidence that makes it more probable that a minor was abused or neglected. The form of corroboration will vary depending on the facts of each case and can include physical or circumstance evidence." *Id*. "Whether there is sufficient corroboration under section 2-18(4)(c) is a determination that must be made on a case-by-case basis." *Id*. at 198.

¶ 75    In this case, the State and guardian *ad litem* contend that S.P.'s out-of-court statements of sexual abuse by Rogelio were corroborated by the following evidence: (1) S.P.'s description of her father's sexual conduct she recounted during her victim-sensitive interview; (2) the physical manifestations S.P. exhibited during her victim-sensitive interview; and (3) Sarah's observation of S.P.'s sexualized behavior toward her brother T.P. We examine each in turn, starting with the disclosures S.P. made in her victim-sensitive interview.

¶ 76     As an initial matter, we note that the parents suggest we review S.P.'s statements of sexual abuse disclosed in her victim-sensitive interview under a *de novo* standard of review rather than a manifest weight standard because the trial court was not in a superior position to evaluate the interview as compared to our court. We decline the parent's invitation to apply a *de novo* standard of review in the instant case. The victim-sensitive interview was only one of several pieces of evidence the trial court relied on to support its findings of abuse and neglect. As a court of review, we cannot pick and choose only the evidence that supports a *de novo* standard of review. We therefore review the trial court's adjudicatory findings under a manifest weight of the evidence standard and not *de novo*.

¶ 77     A minor child is abused under the Juvenile Court Act if a parent commits any sex offense as defined in the Criminal Code of 1961, Criminal Code of 2012, or the Wrongs to Children Act. 705 ILCS 405/2-3(2)(iii) (West 2018). Under the Criminal Code of 2012, sexual penetration of a child is a criminal sexual assault. 720 ILCS 5/11-1.20(a)(3) (West 2016). Sexual penetration is defined as any contact, however slight, between the sex organ of one person and the sex organ of another person; evidence of emission of semen is not required to prove sexual penetration. 720 ILCS 5/11-0.1 (West 2018). Whether sexual penetration occurred is a question of fact. *People v. Janusz*, 2020 IL App (2d) 190017, ¶ 71.

¶ 78     In her victim-sensitive interview, S.P. disclosed that her father's "weewee" touched the skin on the sides of her "weewee." Sexual penetration includes "rubbing and pressing down" on the outer and inner folds of the skin of the vagina. *Janusz*, 2020 IL App (2d) 190017, ¶ 71; *People v. Gonzalez*, 2019 IL App (1st) 152760, ¶ 44. The interviewer asked S.P. where she felt her dad's "weewee." S.P. pointed to her vaginal area and called it "weewee." S.P. said her dad's "weewee" felt "ticklish. Cold." When the interviewer asked S.P. what her dad's body was doing when she

saw his "weewee" she responded "jiggling." When asked to demonstrate, S.P. moved her hips back and forth quickly while sitting. S.P. disclosed that she covered her eyes "because I didn't want to see that weewee." S.P. stated that her underwear was "pretty wet" because her father put them in water. The interviewer asked S.P. what her father did with his "weewee." S.P. said "he pulled up his pants." S.P. said, "And then what happened. And then I told him stop." In a high-pitched tone, S.P. said "Stop it. Then he stopped when I told him. I had to tell him two times, I mean three times." The interviewer asked S.P. if she told her dad that she was going to tell her mother. S.P. answered in a whispered voice, "Yea. He said 'ssshhh be quiet.' " S.P. gestured her index finger to her mouth.

¶ 79    S.P.'s detailed description of Rogelio's conduct constitutes sufficient corroboration of her out-of-court statements of sexual abuse by her father as the detailed description made it more probable that she was sexually abused. See *In re J.L.,* 2016 IL App (1st) 152479, ¶ 99 (minor child's statements of sexual abuse corroborated by her description of sexual matters in a manner beyond the knowledge of a typical seven-year-old girl); *M.D. v. Department of Children and Family Services*, 2015 IL App (1st) 133901, ¶ 106 (child's disclosures of sexual abuse found credible where disclosures utilized age appropriate language, were spontaneous, and demonstrated a level of sexual knowledge beyond what a typical five year old would know); *In re Alexis H.*, 401 Ill. App. 3d 543, 562 (2010) (children's statements of sexual abuse corroborated where they described physical acts of sexual abuse that would be unexpected of children their age); *In re An.W.*, 2014 IL App (3d) 130526, ¶ 65 (perpetrator bribed children to keep quiet about the sexual abuse).

¶ 80    Sarah contends that S.P.'s statements of sexual abuse are unreliable because they contain inconsistencies. We disagree. Conflicts or inconsistencies in a minor's statement do not necessarily

destroy its credibility, but rather only affect the weight to be given to the statement. *In re An.W.*, 2014 IL App (3d) 130526, ¶ 65. Any inconsistencies in a minor's statements are for the trial court to resolve. *Id.*

¶ 81 The parents point out that S.P. did not see or feel anything come out of her father's "weewee" and did not describe any semen. As aforementioned, evidence of emission of semen is not required to prove sexual penetration. 720 ILCS 5/11-0.1 (West 2018). Moreover, as our court noted in *In re C.C.*, 224 Ill. App. 3d 207, 214 (1991), "[a] five year old would not have been able to describe semen unless he had seen it." In this case, S.P. told the forensic interviewer that she covered her eyes because she did not "want to see that weewee." In addition, the trial court noted that S.P. described her underwear as being "wet." The court found that any suggestion that S.P.'s underwear was wet because Rogelio washed them or because he took a shower before he interacted with S.P. did not make sense.

¶ 82 Rogelio argues that no signs of sexual abuse were found in S.P.'s physical exam. However, S.P.'s medical record noted that a normal "exam does not prove or disprove sexual abuse/assault even if vaginal and/or rectal penetrating trauma did occur." In addition, medical evidence is not required to establish corroboration where other corroborative evidence is included in the record. *Trinidad C. v. Augustin L.*, 2017 IL App (1st) 171148, ¶ 28.

¶ 83 Sarah points out that at the dispositional hearing, the trial court received a letter from S.P.'s therapist noting that during S.P.'s therapy sessions, she never disclosed or exhibited behavior that would indicate she had been sexually abused. The court, however, was informed that the therapist had never seen S.P.'s victim-sensitive interview. Therefore, we find the court correctly gave little weight to the letter.

¶ 84 Sarah contends, citing no authority, that even if S.P.'s description of what occurred

between herself and her father is true, "[w]ithout any evidence of a pattern of this behavior, or escalation, it defies belief that a grown man would be sexually gratified by this event." This argument is not only unpersuasive, it is also demeaning and defies common sense. It would be ridiculous to require the State to present evidence of a pattern or escalation of sexual abuse against a child before the State could prove that the child was a victim of sexual abuse.

¶ 85    S.P.'s out-of-court statements of sexual abuse were also corroborated by her physical manifestations exhibited during her victim-sensitive interview. When the interviewer asked S.P. what her dad's body was doing when she saw his "weewee" she responded "jiggling." When asked to demonstrate, S.P. moved her hips back and forth quickly while sitting. These physical gestures provided additional corroboration for S.P.'s hearsay statements of sexual abuse. See *In re J.L.,* 2016 IL App (1st) 152479, ¶ 99 (minor child's back and forth arm movement provided additional corroboration of her prior statements of sexual abuse).

¶ 86    The parents cite to *In re Marriage of Flannery*, 328 Ill. App. 3d 602 (2002) in support of their contention that a child's physical actions should not be considered corroborating evidence of sexual abuse. In *Flannery*, the child's physical actions were offered to prove the mother's claim that the child was sexually abused. *Id.* at 614. On appeal, the reviewing court held that the child's physical actions constituted hearsay because it was offered to prove the mother's claim of sexual abuse. The reviewing court determined that a child's physical conduct, while making an out-of-court statement of sexual abuse, by itself, is insufficient to corroborate the hearsay statement. *Id.*

¶ 87    The facts in this case are distinguishable from those found in *Flannery*. In *Flannery*, there was no nonhearsay evidence independent of the child's out-of-court statements. *Id.* at 610-15. Here, S.P.'s out-of-court statements of sexual abuse were corroborated by nonhearsay evidence such as Ms. Corona's testimony and S.P.'s disclosures to her mother, which prompted Sarah to

take S.P. to the hospital emergency department to be evaluated for possible sexual abuse.

¶ 88    This leads us to yet another piece of corroborating evidence. Sarah's hearing and observation of what S.P. said and did to her brother T.P. at the family home provided additional corroboration for S.P.'s statements of sexual abuse disclosed in her victim-sensitive interview. Sarah brought S.P. to the emergency department at Lurie Children's Hospital to be evaluated for signs of possible sexual abuse after she observed S.P.'s sexualized conduct toward her brother.

¶ 89    At the family home, Sarah overheard S.P. tell T.P. to "sit with his hands behind his back" and to "do it right or I'm not going to give you candy." When Sarah looked in on the children, she observed S.P. laying on top of T.P. in a "push up" position with their pelvises touching and S.P. moving in a sexual-like manner. Sarah asked S.P. where she learned this behavior and S.P. initially replied "the video," but then whispered "papi did it." Sarah asked S.P., "how did this happen?" S.P. responded "he squished me like a sandwich; he told me not to tell you and he would give me ice cream." Sarah's hypervigilance and anxiety were not the sole reasons for her concerns when she observed S.P.'s sexualized conduct.

¶ 90    Sarah reported that S.P. often mimics adults. A reasonable inference is that S.P. was reenacting the sexual behavior she experienced at the hands of her father, when she was interacting with her brother.

¶ 91    In sum, the totality of the evidence corroborated S.P.'s out-of-court statements of sexual abuse. Therefore, we find that the trial court's finding that S.P. was sexually abused by Rogelio was not against the manifest weight of the evidence. For these reasons, we affirm the court's adjudicatory order.

¶ 92                                  B. Dispositional Order

¶ 93    Rogelio challenges the trial court's dispositional order "insofar as it is a prerequisite for

21

appeal, and claims that the trial court erred in finding the minors abused or neglected, which would render the dispositional hearing order void." Sarah challenges the portion of the court's dispositional order holding that the no-contact order would remain in effect until Rogelio completed a sex offender evaluation and the court received a recommendation from S.P.'s therapist that it would be clinically appropriate for there to be contact between S.P. and her father.

¶ 94     Under section 2-7(1) of the Juvenile Court Act, a trial court may commit a minor to DCFS wardship if the court finds that the parents are "unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents." 705 ILCS 405/2-27(1) (West 2018); *In re Ta. A.*, 384 Ill. App. 3d 303, 306-07 (2008). We review a trial court's dispositional decision under a manifest weight of the evidence standard. *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the court selected an inappropriate disposition. *In re Jennifer W.*, 2014 IL App (1st) 140984, ¶ 44; *In re J.C.*, 396 Ill. App. 3d at 1060.

¶ 95     We find the trial court's findings were supported by the evidence and that the dispositional order selected by the court was appropriate. At the dispositional hearing, evidence was presented that Rogelio continued to deny that he sexually abused S.P. and he expressed reluctance to engage in sex offender services. The integrated assessment for Sarah recommended child-parent psychotherapy but noted that this service could not be put into place until Sarah acknowledged that Rogelio had sexually abused her daughter.

¶ 96     In light of the parent's continued refusal to acknowledge that Rogelio sexually abused S.P., we cannot say that the trial court's dispositional order holding that the no-contact order remain in

effect until Rogelio completed a sex offender evaluation and the court received a recommendation from S.P.'s therapist that it would be clinically appropriate for there to be contact between S.P. and her father, was against the manifest weight of the evidence. For these reasons, we affirm the court's dispositional order.

¶ 97                                    III. CONCLUSION

¶ 98    Accordingly, for the foregoing reasons, we affirm the trial court's adjudicatory and dispositional orders.

¶ 99    Affirmed.