2026 IL App (1st) 250340

SECOND DIVISION
February 26, 2026
Modified Upon Denial of Rehearing May 12, 2026

No. 1-25-0340

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| *In re* S.M., | ) | |
| | ) | |
| Minor-Appellee. | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | 23 JA 772 |
| v. | ) | |
| | ) | Honorable |
| M.M., | ) | Lisa M. Taylor, |
| | ) | Judge Presiding |
| Respondent-Appellant). | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     In August 2023, then seven-year-old S.M. told his grandmother that his mother (M.M.,

whom we identify as "Mother") had sexually abused him. When interviewed by a forensic

investigator and prompted, S.M. said nothing of this incident, but after he repeated the accusation

to a Department of Children and Family Services (DCFS) investigator, he was re-interviewed. At

the second forensic interview, he told the interviewer that Mother sexually abused him.

¶ 2     Based on that and an unrelated claim that Mother was dating an abusive partner, the State

filed a petition for an adjudication of wardship for S.M. At the adjudication hearing, nearly all

the focus was on S.M.'s allegations that Mother sexually abused him, though there was some

evidence of a single incident of domestic violence that S.M. witnessed. The State's evidence consisted of witnesses who spoke with S.M. and videos of his two forensic interviews. But S.M. himself never testified. The trial court found that Mother sexually abused S.M. and made the child a ward of the State.

¶ 3    Though S.M.'s statements were hearsay, the Juvenile Court Act makes a child's hearsay statements admissible if they pertain to allegations of abuse or neglect. But supreme court case law and state law provide that, before those statements can sustain a finding of abuse, one of two things must happen: (1) the child must testify and be cross-examined or (2) other evidence must *independently* corroborate the child's hearsay accusations. *In re A.P.*, 179 Ill. 2d 184, 199 (1997); 705 ILCS 405/2-18(4)(c) (West 2024).

¶ 4    Mother appeals, claiming there was no independent evidence that corroborated S.M.'s hearsay claims. We agree. All the allegedly corroborative evidence came from the same source—the child. That is not independent corroboration under *A.P.* or the applicable statute. We are thus compelled to reverse the portion of the order finding that Mother sexually abused her son. We vacate the court's adjudication order, necessarily vacate the court's judgment at the dispositional hearing that followed, and remand for further proceedings.

¶ 5                                    BACKGROUND

¶ 6    On October 31, 2023, the State filed a petition for an adjudication of wardship of S.M., alleging that Mother had sexually abused him, neglected him because his environment was injurious to his welfare, and abused him because he was at a substantial risk of injury. The factual basis for each allegation in the petition read: "On or about September 22, 2023, this minor [S.M.] participated in a forensic interview during which he disclosed that [Mother] had inappropriately touched his penis and sexually abused him. In August of 2023, this minor

disclosed witnessing [Mother] being injured during a domestic altercation between her and her paramour."

¶ 7    The adjudication hearing in this case spanned four days in 2024—one in April, one in June, and two in October. The State prosecuted the case; S.M.'s father, whom we identify only as "Father," was represented by counsel; S.M. was represented by a guardian *ad litem* ("GAL").

¶ 8    The witnesses included S.M.'s paternal grandmother, whom we identify only as "Grandmother," who testified to S.M.'s initial outcry on August 7, 2023; two DCFS investigators, one of whom testified that S.M. said that Mother sexually abused him; and the forensic interviewer who conducted the victim sensitive interviews, or "VSIs." Again, while many of the witnesses testified about what S.M. told them, S.M. himself never testified.

¶ 9    The case encountered some unavoidable delay. After the State presented its case and rested on the first day of the hearing, the parties argued over a witness the mother wanted to call. The court continued the case, but at the next court date, Mother's attorney, an assistant public defender, moved to withdraw because the relationship between her and Mother had broken down. The court granted the continuance.

¶ 10    The case resumed in October, now with new counsel for Mother. Mother presented her case, in which most witnesses who testified in the State's case testified again. For ease, in some instances, we have combined the separate days of their testimony together.

¶ 11    We will say at the outset that we have numerous questions left unanswered by the record. We will at times point them out as we recite the facts, while they are still fresh in mind.

¶ 12    One of the most significant is worth mentioning at the start: In addition to what he said about Mother, S.M. also said that he was sexually abused by a boy named Damian, whom S.M. claims was eight years old (when S.M. was six). The abuse allegations involving Damian are not

part of the charges against Mother, and we know very little about Damian or what came of these allegations, if anything. We do not even know if we are spelling Damian's name correctly; we are adopting the guess of the court reporter from the hearing. We know of this boy only from S.M.'s statements to Grandmother and investigators.

¶ 13    As we discuss below, S.M. mentioned two distinct episodes of sexual contact with Damian in his conversation with Grandmother on August 7, and he mentioned three distinct episodes of sexual contact with Damian in his second VSI on September 22. It is not clear whether that makes four or five separate instances of sexual contact with Damian; it is possible that one of the episodes he related to Grandmother overlapped with one he discussed in the second VSI. As we will see, the presence of Damian will loom large throughout this case.

¶ 14                              I. State's Case-in-Chief (April Hearing)

¶ 15                              A. Outcry to Paternal Grandmother

¶ 16    The State first called Grandmother, who testified that on August 7, 2023, S.M. was staying with Father and her at Grandmother's house. S.M. typically lived with Mother but had been staying with Father at Grandmother's house for over a week, since July 29. (As we will see later, there was a dispute between Mother and Father over how long S.M. would stay there.)

¶ 17    According to Grandmother, on that day, August 7, 2023, S.M. told her that he "went to a friend [*sic*] house, and he did some inappropriate touching." When asked to elaborate, she said that S.M. told her that he "touched his friend in his private area." When S.M. was telling her about this incident with Damian, "[h]e was nervous. He was wringing his hands. He was turning red, and he started to cry." (The GAL claims that the boy S.M. was identifying here was not Damian but a different friend; that is not clear from the record, but that potential difference will not affect the substance of our analysis.)

- 4 -

¶ 18    Grandmother added that S.M. "just started crying because he was nervous. And he started crying. And I asked him, like, where did he get this from? You know, I had already explained to him about good touching and bad touching. We talk about it all the time."

¶ 19    Present for this conversation between Grandmother and S.M., initially, were Father and Grandmother's daughter (Father's sister). But when Father heard S.M. say that he touched Damian's private parts, he left the room. We would later learn that he left the house entirely.

¶ 20    When Grandmother asked him why he would do something like touch Damian in his private parts, S.M. "stated that his mom said that when he's emotional about someone, he's allowed to do that to them."

¶ 21    The State then zeroed in on S.M.'s talk of his mother:

"Q: What specific words did he use when he started talking about his mother?

A: *** [H]e said that his friend, Damian, was at his house. And he said that Damian had touched him in his private area. [S.M.] told him to stop. [S.M.] stated that Damian shoved him in the closet and punched him. [S.M.] stated his mother came in the room. When his mom came in the room ***, when she came in the room, she asked him what was wrong. He stated what had happened with Damian. And that's when [Mother] approached him and she told him that it's okay. She said that when we're emotional about people, that we're allowed to, you know, show our emotions."

¶ 22    According to Grandmother, S.M. told her that Mother then

"walked him to the bed. She touched him between his legs and touched his penis. He said that she touched his private. He stated that she told him that she like [*sic*] it. She proceeded to lay him down on the bed. She pulled his pants down. She touched him between his legs. She put his penis in her mouth. She sucked it."

¶ 23    Mother told S.M. that it was to be their secret. Mother threatened him, saying that if he told anyone what happened, he would not be able to see his dad until he was 27 years old.

¶ 24    Grandmother told S.M. she would keep him safe. She went downstairs to find Father; upon discovering that he had left the house, Grandmother decided to report S.M.'s claims to the police herself. A police officer arrived. Grandmother was present for the conversation between S.M. and the police, but the content was not discussed in her testimony. In fact, there was no further testimony from Grandmother on what she and S.M. discussed that night, or on any other occasion over the next few months of the investigation, regarding Mother's sexual abuse.

¶ 25    Grandmother testified that Father and Mother quarreled frequently and had a contentious relationship. But she generally considered Mother to be like a daughter to her and often took Mother's side in the fights. That was the extent of her direct testimony at the April hearing.

¶ 26    This was the cross-examination, in its entirety, of Grandmother, the first person to whom S.M. made these allegations of sexual abuse, and the person with whom S.M. stayed for over a month after these allegations emerged:

> "Q: About how old was [S.M.] when you spoke to him in August of 2023?
>
> A: 7.
>
> Q: And does [S.M.] have a nickname?
>
> A: Yes.
>
> Q: And what is that nickname?
>
> A: [Redacted].
>
> Q: Thank you. Nothing else."

¶ 27                              B. First Interview with Arroyo

¶ 28    After S.M.'s outcry and the initial investigation, S.M. visited the Chicago Children's

Advocacy Center (CAC) for a forensic interview with America Arroyo, a trained professional forensic interviewer. Her first of two interviews with S.M. took place on August 18, 2023, eleven days after his outcry to Grandmother. A video of this interview was entered into evidence.

¶ 29    Arroyo, a trained forensic interviewer, testified that when she met with S.M, he acted at an appropriate level for his age. Only the two of them were in the interview room together, though members of the investigative team could observe the interview through a one-way mirror. Arroyo said that it was not her job to make a "professional assessment" of the child or determine if a child is telling the truth; she only conducts the interview.

¶ 30    In her first interview with S.M., Arroyo told S.M. that her job was to listen to him, and that S.M. could tell her anything he wanted without getting into trouble. S.M. began by talking about playing at the park and how he enjoyed playing on the swings. He told her that he lives at home with Grandmother, but that he used to live with Mother.

¶ 31    When Arroyo asked what might happen when S.M. got in trouble, S.M. told her that he sometimes would get a "whooping." After numerous questions trying to get S.M. to elaborate on what getting a "whooping" meant, S.M. told her that Father would smack him on his back. He also said that he once got a "whooping" with charger cords.

¶ 32    Arroyo walked S.M. through the rules of the interview. She told him that, when she asks him a question, he should not guess the answer. S.M. appeared confused, but Arroyo followed up by discussing with S.M. the difference between the truth and a lie. S.M. said that he understood and was able to identify when Arroyo told him a lie and when she told him the truth.

¶ 33    Arroyo then asked S.M. several direct questions. First, she asked him if something happened that wasn't supposed to happen; S.M. said no. Arroyo then discussed bodies, specifically body parts that nobody should touch. S.M. said that he called those areas of his body

his "private parts" and identified his "butt" and the thing that he "pees" out of as his "thing."

¶ 34    Arroyo asked him if something happened to or someone did something to his butt; S.M. said no. Arroyo asked S.M. if something happened to his "thing" or if someone did something to his "thing," and again, S.M. said no. S.M. told Arroyo that, if something had happened, he would have run away. S.M. also said that nobody showed parts of their body to him, nor did anyone ask to see parts of his body.

¶ 35    After a brief break in the interview, Arroyo asked S.M. about his friend Damian. S.M. told her that Damian was a friend with whom he played. S.M. did not know Damian's last name when Arroyo asked him. Arroyo also inquired if Damian did something mean to S.M. or something that he did not like, and S.M. said no.

¶ 36    When asked about Mother, S.M. told Arroyo that they had fun together and told Arroyo that they went to the water park together. When Arroyo asked S.M. directly if his mother did something mean to him or something he did not like, S.M. said no. And S.M. told Arroyo that if he got into trouble with Mother, nothing happened. S.M. did not like his mother's boyfriend, "Trayco," however. He told her that he once saw Trayco "bust" his mother's nose open. Trayco also slammed the door in S.M.'s face, something he didn't like.

¶ 37    S.M. said nothing in the first interview about Mother sexually abusing him. Arroyo ended the interview shortly after he talked about Trayco.

¶ 38                    C. Interview with DCFS Investigator Berrios

¶ 39    Georgina Berrios, a DCFS child-protection specialist assigned to investigate the allegations, testified that she initially spoke with Father about the investigative process. Father told Berrios that he was interested in getting an order of protection against Mother for S.M. Berrios later wrote a letter for the court supporting Father's request for an order of protection in

which she provided an overview of her investigation without giving too many details. Berrios also spoke with Mother on August 17, 2023, and informed her that she was being investigated and generally of the allegations. Mother denied the allegations when Berrios read them to her. However, per department policies, Berrios did not interview Mother.

¶ 40    On August 21, 2023, Berrios spoke with S.M. at Grandmother's home. Father and his sister, S.M.'s aunt, were at home. Berrios took S.M. aside and spoke with him privately.

¶ 41    Berrios introduced herself to S.M. and told him that she was there to check on him and that it was her job to talk to children about safety. She discussed with S.M. what "safe" means, and they discussed the private areas of their bodies and bodily safety to make sure that nobody was touching S.M.'s body parts that were not supposed to be touched.

¶ 42    During the conversation, S.M. mentioned Damian, but when Berrios began to ask him what happened, S.M. stopped talking about it. Berrios then asked S.M., "[D]id anything else happen to you that shouldn't have happened?" S.M. then mentioned that Mother "tried to put my thing in her mouth." When Berrios asked if she tried to or actually did put his thing in her mouth, S.M. replied that "Yes, she did it." S.M. then said that Mother told him that is what happens when "boys get emotional." S.M. said that Mother took him into his room, pulled down his pants, and put his "thing" in her mouth. Berrios confirmed with S.M. that he calls his penis his "thing."

¶ 43    Berrios testified that she believed her evaluation started to make S.M. uncomfortable, so she decided not to pry further. She testified that, before she started talking to S.M. about his body safety, he appeared very happy and was smiling. When Berrios began to ask S.M. about the incident with Damian and then with Mother, he was not talking as much and seemed to close off. Berrios did admit, however, that she was "not a body language expert."

¶ 44    After this conversation with S.M., Berrios met with her supervisor and others at the CAC. The group decided it would be appropriate to interview S.M. again.

¶ 45                            D. Second Interview with Arroyo

¶ 46    Arroyo testified that a second interview with a child over the same incident is unusual. She conceded that "[i]t is best practice to not conduct second follow-up interviews." She estimated that, of the approximately 600 interviews she has conducted, "definitely less than 30" of them were second interviews of a child.

¶ 47    But there are reasons why a second interview might be necessary, she said, including when new evidence comes to light or the child makes an "additional outcry." And here, S.M. had made an additional outcry to Berrios.

¶ 48    Arroyo conducted her second forensic interview with S.M. on September 22, 2023. This would be some six weeks after the first outcry to Grandmother (on August 7) and around a month after Arroyo's first interview with S.M. (August 18) and the additional outcry to Berrios (August 21).

¶ 49    As we explain below, S.M. did tell Arroyo that Mother sexually abused him on a single occasion. But he also told her that, on at least three occasions when he was six—at least some of which came before the alleged abuse by Mother—he was sexually abused by Damian, who performed oral and anal sex on him.

¶ 50    In that second forensic interview, Arroyo again told S.M. the rules of the interview, that he shouldn't try to guess any of the answers to the questions, and walked him through the difference between the truth and a lie. S.M. accurately identified a lie and the truth and promised to tell the truth.

¶ 51    When asked if he knew the reason for the interview, S.M. said that it was because of

"something that I did wrong." He told Arroyo that he got in trouble and couldn't play a game at school. Arroyo then asked S.M. about parts of his body, including his "butt" and his private areas. When asked if something happened to his bottom, S.M. answered "no," then paused briefly before saying "yes." Arroyo inquired further; S.M. told her that he felt upset when it happened, and that his friend Damian "did it."

¶ 52    Arroyo then asked S.M. several open-ended questions to get S.M. to elaborate. He told her that something happened in his room at his "old house" when Damian "stuck his thing" into S.M.'s bottom. S.M. said that he was lying down on the bed on his stomach when it happened, and that Damian pulled off S.M.'s clothes and underwear (which S.M. referred to as his "drawers"). Damian took off his clothes, too, and then put his "thing" in S.M.'s "butt."

¶ 53    When asked if Damian was making any noises, S.M. mimicked heavy breathing. S.M. told Arroyo that it felt uncomfortable. S.M. also said that Damian asked S.M. to put his thing in Damien's bottom. S.M. told Damian that he did not want to do that, but Damian told him to do it or that he would smack him. Still, S.M. refused to do it. Nobody else was in the room at the time, S.M. said, and afterward, they went somewhere to get something to eat. He said he told the police first, then Grandmother, Father, his aunt and uncle about this incident.

¶ 54    After a few more questions, S.M. also said that, at a different time, Damian "sucked" his "thing." This first happened in S.M.'s room at his house. Damian pulled S.M.'s clothes down. Damian pushed him on the bed and "sucked" S.M.'s "thing." At some point, S.M. told Damien to stop, and Damien stopped. When asked if this happened only once or more than once, S.M. answered "more than one time."

¶ 55    Another time was at Damian's grandmother's house, S.M. said, while his mom and Damian's dad were sleeping. S.M. was in Damian's room when Damian pushed him onto the

bed and used his mouth to suck S.M.'s "thing." S.M. eventually told Damian to stop, and he did.

¶ 56    Arroyo then asked S.M. if someone else ever did something to S.M.'s "thing." S.M. first said "no," then quickly said "yes" and said that Mother did. Arroyo asked him what happened, and S.M. told her that that his mother took him into her room, pulled down his pants, and "tried to suck [his] thing." S.M. said he pushed her away. Arroyo asked for more details, and S.M. elaborated that he was lying down flat, and Mother was lying down on her stomach next to him. His pants and his "drawers" were pulled down, and mom's clothes and "panties" were down as well. She tried to suck on S.M.'s thing, and S.M. said he could feel her mouth on his "thing" and that he could feel her private parts on him. Then she stopped and sent S.M. to his room.

¶ 57    When Arroyo tried to elicit a few more details, S.M. said at one point that Mother was "humping" him. When asked what "humping" meant, S.M. said it "means that they go faster." S.M. described his mother moving faster while lying down. Arroyo asked him how many times this happened, and S.M. said it happened once, when he was six years old.

¶ 58    When Arroyo questioned S.M. about the incident with Mother, S.M. often paused for periods of time. He also could not remember whom he first told about the incident with Mother.

¶ 59    At the end of this interview, the following colloquy took place:

> "Q. Did anyone tell you what to say today?
>
> A. Yes. My gramma, dad, auntie, and uncle.
>
> Q. What did they tell you?
>
> A. To tell the people what your mom did."

¶ 60                                    II. Defense Case (April Hearing)

¶ 61                                    A. Mother's Testimony

¶ 62    Mother testified at the adjudication hearing, once in April and again in October after a

- 12 -

continuance. We start here with her testimony in April. From the outset, Mother denied performing any kind of sexual act on or touching S.M. in any kind of sexual way. Mother said that she had been S.M.'s primary caregiver and that, up to that point, he had lived with her most of his life. While he was living with Mother, S.M. was in school at a local academy and had great attendance, other than a few missed school days to get treatment for epilepsy.

¶ 63    S.M. went to stay with Father on July 29 and was supposed to stay with him only for the weekend. Father and Mother worked out this arrangement by phone calls and text messages. Against Mother's wishes, however, Father wanted to keep S.M. longer, through the remainder of the summer until school resumed. Father and Mother argued over this point by phone, including voicemails and text messages.

¶ 64    Mother's counsel tried to admit into evidence printouts of text messages and transcripts of "four belligerent voicemails" to illustrate the level of contentiousness. The State, GAL, and Father objected. Father's counsel did not "see the relevance to this conversation," as it had "nothing to do with the allegations in the petition."

¶ 65    Defense counsel argued that the text messages and voicemails were critical "context" for the first outcry from S.M. that would come on the heels of, and indeed amid this dispute between Father and Mother. Defense counsel's theory was that Father and Father's family had pressured the child into saying something about Mother that was untrue so that S.M. would stay with Father and his family, not Mother. In counsel's words: "these statements by the child are the result of pressure applied by the father's family with the goal of continuing to keep the child away from the mother, which was an endeavor that was started August 1st, 2023 when [Father] wrongfully refused to send [S.M.] back home after what was supposed to be a short-term visit and that this started before the very first so called outcry" that occurred on August 7.

¶ 66    The State replied that the proffered messages from Father to Mother were merely "a domestic incident between the mom and dad on who's going to have more time with the kid and when." Defense counsel made an offer of proof that

> "the text messages from [Father] don't just say he wants to keep him. They start off flatly telling mother I'm not sending him back. Again, this situation with these statements that the child has started making come on the heels of [Father's] refusal, wrongful refusal, to send the child back home as had been agreed upon. This is all part of the same scheme to wrongfully withhold custody of her son from [Mother]. *** I would also make the offer of proof that during the course of this text discussion, [Father] sent [Mother] a total of four belligerent voicemails that were part of it. This wasn't just a dispute between parents about visitation. This was [Father] wrongfully hanging on to [S.M.] and refusing to send him back to his home to the person who had been taking care of [S.M.] all his life. And these statements that the child started making after having been wrongfully withheld by [Father] are connected to that whole situation."

¶ 67    The trial court sustained the objection. The court did not believe that evidence of a contentious dispute over S.M. between Father and Mother, which had begun just days before S.M.'s first outcry to Father's mother, was relevant to the credibility of S.M.'s allegations. So the court denied the admission of any evidence of the text messages or voicemails.

¶ 68    With that, the questioning of Mother ceased.

¶ 69                    B. Additional Proffered Evidence of Pressuring

¶ 70    After Mother's testimony, defense counsel sought to call Reverend Terry Lenoir to testify. A week earlier, Mother was given leave to amend the case management order to identify four additional witnesses. They included S.M.'s godparent, a family friend, S.M.'s maternal aunt,

and Reverend Lenoir.

¶ 71    The GAL objected to lack of notice and timeliness, arguing that defense counsel had indicated that she would not call Reverend Lenoir, even though she had just named him in the amended case management order. The GAL also argued that the prejudicial nature of Reverend Lenoir's testimony outweighed its probative value.

¶ 72    In her offer of proof, defense counsel conceded that she had not initially intended to call Reverend Lenoir:

> "However, my investigator had a follow-up conversation with him. My investigator e-mailed me this morning with the—with a summary of what Mr. Reverend Lenoir had told her during the follow-up conversation. My offer of proof would be that if he was called to testify, Reverend Terry Lenoir would testify that during December 2023, via either a Facetime or Zoom conversation with the minor, the minor, [S.M.], told him that 'his grandmother was pushing him to say something he did not want to say,' and that after the minor had disclosed this to him, Reverend Lenoir told the minor to tell the truth."

¶ 73    In addition to the GAL's objection, Father's counsel challenged the relevance of this testimony because it was "post-petition"—these events occurred after the September 2023 VSI in which S.M. told the interviewer of Mother's sexual abuse. The GAL joined in this objection.

¶ 74    The court ruled that Reverend Lenoir's testimony was admissible. The GAL asked for a continuance to prepare for his testimony. The court continued the matter to June 13.

¶ 75                              III. June 13 Hearing Date

¶ 76    The June 13 hearing date was cut short, as counsel for Mother moved to withdraw, citing a breakdown in the attorney-client relationship and noting that Mother was dissatisfied with her performance and wanted a new lawyer. The court granted the motion to withdraw and continued

the case to October so that new appointed counsel could get up to speed on the case.

¶ 77                    IV. Defense Motion for New Hearing and to Reopen Discovery

¶ 78    In September, new counsel for Mother moved for "a new adjudicatory hearing" and to "reopen discovery." The motion made several claims. Among them:

    (1) The record failed to explain why S.M. was subjected to a second VSI after he did not identify Mother (or anyone else) as a sexual abuser in the first one;

    (2) On "January 27, 2022, [S.M.] made an outcry of inappropriate touching on his private parts by two schoolgirls." The motion claimed that DCFS investigated the allegations and deemed them "unfounded;"

    (3) S.M. identified the minor named Damian as someone who sexually abused him on several occasions, but "[t]he substance of the DCFS investigation[,] although germane, remains a mystery;"

    (4) "On August 2023, [S.M.] made a[n] outcry [of] biological father physically whipping him with a telephone cord," but according to the motion, a DCFS investigation deemed that allegation "unfounded."

¶ 79    The motion argued that "justice and fairness" demanded the production of certain materials, including any files pertaining to Damian and any written or oral records relevant to the decision to conduct a second VSI. The motion also asked for any police reports or audio tapes of statements S.M. made to the police after his initial outcry on August 7 to Grandmother.

¶ 80    We have no transcript of any subsequent hearing. The record shows that Mother later withdrew her motion for a new adjudicatory hearing. The motion for discovery was granted in part, requiring the turnover of "[a]ll additional discovery," including "documentation, witnesses, [and] witness contact information" before the continued adjudication hearing. The record does

not disclose what "additional discovery" entailed or what was, in fact, turned over to the defense.

¶ 81                    V. Defense Case Resumed (October Hearing)

¶ 82                           A. Reverend Lenoir

¶ 83    When the hearing resumed in late October 2024, Reverend Lenoir was ready to testify. Recall that the offer of proof was that the reverend would testify that S.M. told him that "his grandmother was pushing him to say something he did not want to say," and his advice to S.M. was to "tell the truth."

¶ 84    But the State and GAL again objected once more, this time claiming that he had not been properly disclosed to the parties and was not listed on the most recent case management order, which new counsel had amended. As this was the second amendment to the case management order, the most recent one had been titled "Amended Supplemental Case Management Order."

¶ 85    It was technically true that this third version of the case management order did not list Reverend Lenoir. New defense counsel argued that the latest version should be read to incorporate all previous versions and, in any event, opposing counsel had known of Reverend Lenoir for six months, since the previous April, when counsel had asked for a continuance specifically to interview the reverend. Counsel for the GAL stated that she had tried to speak with Reverend Lenoir but had been unsuccessful. She also stated, in closing, that "Mr. Lenoir was never disclosed in any written [case management order] that was entered by this Court," which is incorrect—the record shows that Reverend Lenoir was disclosed on the April 5 order.

¶ 86    Regardless, the circuit court barred Reverend Lenoir from testifying, finding that he was not properly disclosed as a witness.

¶ 87                           B. Grandmother (Recalled)

¶ 88    Mother called Grandmother in her case-in-chief. Grandmother testified about an incident

years before the August 2023 outcry, in July 2019, that resulted in her being arrested for allegedly battering Mother. Grandmother said that Mother had called the police on her and told the police that everyone at the house had "jumped on her." Grandmother was arrested, but the case was dismissed when Mother did not appear in court. Grandmother said that she had never put her hands on Mother.

¶ 89    Grandmother also testified about an incident in September 2022, which also predated the conversation with S.M. by nearly a year. Mother messaged and called Grandmother, asking if she could stay with her for a while. Mother told Grandmother that Mother's boyfriend at the time, Travaughn Steele, had physically battered her. Grandmother agreed to take Mother and S.M. in, and when Mother arrived, Grandmother noticed she was bruised and had several marks on her face and body. Mother told her that Travaughn had caused them.

¶ 90    Sometime in August 2023, Grandmother caught S.M. watching pornography on an iPad in her home. Grandmother testified that she asked S.M. if he had watched pornography before, and he said yes. Upon further questioning as to when S.M. *first* started watching pornography, Grandmother believed it had been recently, in the week or month before she caught him, though she noted that S.M. did not have a good sense of time and could not provide a reliable answer.

¶ 91                    C. DCFS Investigator LaShawn Campbell (Recalled)

¶ 92    LaShawn Campbell, a former DCFS investigator, who testified briefly in the State's case-in-chief, largely to lay the foundation for the admission of the VSI videos, was recalled by Mother. Campbell had taken over S.M.'s case from the previous investigator, Berrios, when Berrios went on parental leave. Campbell was present during the second interview with Arroyo; though she was not in the room with S.M., she watched and listened as Arroyo questioned him from behind a one-way mirror. Based on what S.M. said to Arroyo during his second forensic

interview, Campbell, her supervisor, and other staff decided to take protective custody of S.M. and file a petition for adjudication of wardship.

¶ 93    Defense counsel questioned Campbell on whether she followed up on certain matters related to S.M. Campbell stated that she did not further investigate the allegations regarding Damian. She did not report Damian to the authorities, either, as the forensic interviewer (Arroyo) had the responsibility of mandatory reporting after S.M. identified him in the VSI.

¶ 94    Campbell also said she learned that S.M. had been caught watching pornography. She learned this from Grandmother at some point during the investigation—that is, sometime between August and October 2023. She did not follow up on this information or ask S.M. about it because, per DCFS policy, once a child is forensically interviewed, they should not be questioned again by DCFS investigators.

¶ 95                                D. Mother

¶ 96    Mother testified briefly for a second time in her own defense. She testified that she was unaware of any friend of S.M. named Damian. Nor was she aware of any playmate of S.M. whose name sounded like or rhymed with "Damian."

¶ 97                           VI. Court Ruling

¶ 98    After four days of testimony, the trial court concluded that the State proved by a preponderance of the evidence that S.M. had been sexually abused, neglected because his environment was injurious to his welfare, and abused because he was placed at risk of substantial physical injury. In doing so, the court found that each of the State's witnesses—Grandmother, Berrios, Campbell, and Arroyo—testified credibly. The court addressed the specific allegations:

          "That brings this Court for all of these reasons, looking at the totality of

          the evidence, most specifically, the [interviews with Arroyo], both the August

18th and the September 22nd, listening to the minor's words, watching his body language, and also hearing the adult testimony *** [the court] finds that by a preponderance of the evidence, the minor is abused and neglected as defined by the Juvenile Court Act (neglect) injurious environment, (abuse) substantial risk of injury, and sexual abuse because of the factual basis set forth on the record is the language I want."

¶ 99     The court conducted a dispositional hearing on January 29, 2025. After hearing testimony and argument, the court found that Mother was unable to care for, protect, train, or discipline S.M. and placed him in the guardianship of DCFS. Mother now appeals.

¶ 100                                           ANALYSIS

¶ 101    This case comes to us after the trial court, on a petition filed by the State seeking an adjudication of wardship, found that S.M. had been sexually abused, abused, and neglected, and made S.M. a ward of the court. See 705 ILCS 405/art. II (West 2024). The Juvenile Court Act lays out a two-step process to determine if a child should be made a ward of the court. See *id.*

¶ 102    The first is an adjudication hearing, where the court only determines if the minor has been abused, neglected, or is dependent. *Id.* § 2-18(1); *In re Z.L.*, 2021 IL 126931, ¶ 59. If the court makes such a finding, the case proceeds to a dispositional hearing, where the court must decide whether it is consistent with the health, safety, and best interests of the minor and the public that the child be made a ward of the court. *Z.L.*, 2021 IL 126931, ¶ 60. Each case involving neglect or abuse is *sui generis* and must be decided on the unique circumstances of the case. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004); *In re N.B.*, 191 Ill. 2d 338, 346 (2000).

¶ 103    Here, the State alleged that S.M. had been sexually abused, neglected because he was in an injurious environment, and abused because he was at a substantial risk of physical injury. 705

ILCS 405/2-3(1)(b), (2)(ii), (iii) (West 2024). The State bears the burden of proving the allegations of abuse or neglect by a preponderance of the evidence. *Z.L.*, 2021 IL 126931, ¶ 61. We will not disturb the trial court's finding of abuse or neglect unless that finding is against the manifest weight of the evidence—that is, if the record demonstrates that the opposite result is clearly evident. *In re K.G.*, 288 Ill. App. 3d 728, 735 (1997).

¶ 104                    I. Corroboration of Sexual Abuse

¶ 105    On appeal, Mother argues that the State's case that she sexually abused her son rests entirely on S.M.'s uncorroborated hearsay statements. S.M. did not testify at the adjudication hearing, but his words were heard throughout the hearing and were the lynchpin of the State's case. To recap: Grandmother testified that S.M told her that he had touched a friend, Damian, in his private area. When Grandmother asked him why, S.M. told her a story that ended with him alleging that his mother performed oral sex on him and rubbed her body up against his.

¶ 106    Berrios, a DCFS caseworker who interviewed S.M., said that S.M. told her something similar about his friend Damian and about Mother, though he stopped talking at a certain point, and Berrios didn't push further. And two videos of S.M.'s forensic interviews with Arroyo were entered into evidence, where she questioned him about what occurred. In the first interview, he did not say anything happened, but in the second, about a month after the first, he repeated his claim that Mother (and Damian) had sexually abused him.

¶ 107    All of S.M.'s statements were made out of court and offered for the truth of what they assert—quintessential hearsay. Hearsay, any out-of-court statement that is offered to prove the truth of the matter asserted, is not admissible except otherwise provided by statute or supreme court rule. Ill. R. Evid. 801(c) (eff. Oct. 15, 2015); Ill. R. Evid. 802 (eff. Jan. 1, 2011). The law bars this kind of evidence because it generally distrusts hearsay, as there is no opportunity to

cross-examine the declarant. *People v. Shum*, 117 Ill. 2d 317, 342 (1987); *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004).

¶ 108   But the usual bar on hearsay evidence can hinder cases when the declarant is a young child alleging abuse; a minor may be "reluctant or unable to testify" (*A.P.*, 179 Ill. 2d at 196) or may "lack the cognitive or language skills to effectively communicate instances of abuse at trial" (*People v. Bowen*, 183 Ill. 2d 103, 115 (1998)). This is a thorny issue in abuse and neglect cases; the law distrusts hearsay evidence because it cannot be tested on the crucible of cross-examination, but it may be difficult to place a young child on that very crucible.

¶ 109   To harmonize these competing principles, the Juvenile Court Act makes a child's hearsay statements admissible in cases brought under the Act when their statements relate to an allegation of abuse or neglect. 705 ILCS 405/2-18(4)(c) (West 2024). That provision reads:

> "Previous statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." *Id.*

¶ 110   The first sentence of the statute, obviously enough, "creates a statutory exception in the context of abuse and neglect cases involving minors to the general rule against hearsay." *A.P.*, 179 Ill. 2d at 196. The second sentence makes clear that the hearsay statement, alone, may *not* support a finding of abuse—either the statement must be corroborated or the minor must be subjected to cross-examination. *Id.* (statute requires corroboration or cross-examination, not both). If neither requirement is met, the evidence, based solely on the child's hearsay, is insufficient as a matter of law.

¶ 111   S.M. did not testify at the adjudication hearing, so "corroboration of the occurrence of the

abuse or neglect becomes very important." *In re An. W.*, 2014 IL App (3d) 130526, ¶ 63. The court's finding that Mother sexually abused S.M. must rest on more than just his hearsay statements—there must be "independent evidence" to corroborate his allegations. *A.P.*, 179 Ill. 2d at 199.

¶ 112    The Juvenile Court Act does not define corroboration, but our supreme court in *A.P.* explained that corroborating evidence is "evidence *supplementary to that already given* and tending to strengthen or confirm it." *Id.* (emphasis added). That is, "corroborating evidence of the abuse or neglect requires there to be *independent evidence* which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." (Emphasis added.) *Id.* Critically here, "sufficient corroboration of the abuse or neglect *requires more than just witnesses testifying that a minor related claims of abuse or neglect to them.*" *Id.* at 198 (emphasis added). If all the evidence relates back to the same source, and that source is the child himself, the evidence is not corroborative.

¶ 113    Over time, Illinois courts have identified many kinds of "independent evidence" that corroborates a claim of abuse or neglect. Medical evidence of abuse is one of the most common and obvious forms of corroboration. See *id.* at 199-200 (medical examination revealing unexpected prior trauma to child's hymen and doctor's conclusion that her vagina had been penetrated); *In re Alexis H.*, 401 Ill. App. 3d 543, 562 (2010) (evidence that eight-year-old abuse victim had open hymen, which doctor considered unusual).

¶ 114    Testimony from experts who have worked with or examined the child also can be corroborative, especially when those professionals conclude that the child has been abused. See *In re M.T.*, 2025 IL App (1st) 232134, ¶¶ 18-20 (therapist, who worked with child for several months, opined that child was victim of sexual abuse because she had symptoms of post-

traumatic stress disorder, experienced disassociation, had intrusive thoughts, and was hypervigilant); *In re C.C.*, 224 Ill. App. 3d 207, 214-15 (1991) (interdisciplinary team at hospital concluded boys had been sexually abused).

¶ 115 So too can eyewitness testimony, especially from others who may have witnessed the abuse or been victims themselves. See *An. W.*, 2014 IL App (3d) 130526, ¶ 65 (children who witnessed and suffered abuse corroborated each other's statements); *Alexis H.*, 401 Ill. App. 3d at 561 (same); *In re K.O.*, 336 Ill. App. 3d 98, 102, 109 (2002) (victim's sibling testified to father's sexual contact with victim).

¶ 116 We have nothing like that here. There was no medical evidence of the abuse, which is not particularly surprising given the specific abuse alleged here, the performance of oral sex on the child some time prior to the outcry. There was no eyewitness, which is not especially surprising, either. Nor, to our surprise, did the State present the testimony of any expert who, upon examination of the child or even of the child's VSI, might be able to offer some opinion on whether the child exhibits certain characteristics of sexual abuse. We know that S.M. has been seeing a therapist since his outcry, and we are told by DCFS investigator Campbell that a team of professionals witnessed the second VSI from outside the room before making the decision to charge the case. Yet we heard from no such expert at trial.

¶ 117 The only evidence proffered—the testimony of Grandmother and the DCFS investigator, Berrios, plus the second VSI—came directly from the child's mouth. And greatly complicating matters is that, to the extent the State manages to cobble together even the thinnest circumstantial corroboration—assuming we could generously term it "corroboration"—it can be just as easily explained by the sexual abuse committed by Damian, which by S.M.'s account was far more frequent than the single episode of abuse S.M. assigned to Mother and happened within the very

same time period. As we will explain, the State and GAL bring Damian's sexual abuse into the conversation when it suits their purposes and ignores it when it does not. We do not have the luxury of being so cavalier with the evidence.

¶ 118    The State and GAL cite the following evidence as corroborative: (1) S.M.'s statements to Grandmother and Arroyo were consistent with each other; (2) Mother's threat to S.M. that he needed to keep the abuse secret or he wouldn't see his father is commonplace in abuse cases; (3) S.M.'s "hypersexualized behavior" in his interactions with Damian and watching pornography is a direct result of the abuse that Mother inflicted on him; (4) S.M.'s use of "age-inappropriate language beyond the knowledge of a typical seven-year-old" could only have come from Mother's abuse; and (5) his behavior when talking to Grandmother and Berrios, along with his behavior during the second VSI, exhibits evidence of Mother's abuse.

¶ 119    At the start, we emphasize that we are looking for *independent corroboration*, not merely evidence that makes his claims more credible. It is a thin but crucial distinction. Both evidence of credibility and corroborating evidence make a proposition more likely to be true. In casual conversation, we might say that evidence that makes a claim more credible "corroborates" that claim. The phrases are nearly interchangeable.

¶ 120    That is exactly why it is critical to emphasize that the statute requires that the child's hearsay statement be corroborated by "*independent* evidence." *A.P.*, 179 Ill. 2d at 198, 199 (emphasis added). If we do not demand independent corroboration of the child's statement, we run the risk of blurring the distinction to the point that the law's requirement of corroboration evaporates entirely.

¶ 121    For example, the fact that the child repeats the allegations to several different people undoubtedly makes the statement more *credible*, but it is not independent corroboration. See *id.*

at 198 ("[S]ufficient corroboration of the abuse or neglect requires more than just witnesses testifying that a minor related claims of abuse or neglect to them."); *In re J.L.*, 2016 IL App (1st) 152479, ¶ 90 (" '[T]he number of times a child repeats an allegation of abuse does not amount to corroboration.' "); *In re Custody of Brunken*, 139 Ill. App. 3d 232, 239 (1985) ("[T]he four witnesses who testified as to [minor's] alleged statements cannot be deemed to have corroborated each other.").

¶ 122   We will now consider each claim of corroboration cited by the State and GAL. But we emphasize here that the question is not whether we think S.M. was telling the truth or whether the trial court was correct to believe him. It is whether the State complied with the law, which requires independent corroboration of the hearsay allegations to sustain a finding of abuse.

¶ 123                        A. Consistency of S.M. Various Statements

¶ 124   The State and GAL argue that S.M.'s statements to Grandmother, Berrios, and the forensic investigator were consistent with one another. We have already noted above that the child's various statements cannot serve as independent corroboration of each other, no matter how many times he repeated them and despite their consistency. See *A.P.*, 179 Ill. 2d at 198; *J.L.*, 2016 IL App (1st) 152479, ¶ 90; *Brunken*, 139 Ill. App. 3d at 239. (That is not to say that S.M. was entirely consistent in his claims—the State and GAL overstate that point—but it is irrelevant, regardless.)

¶ 125                        B. Mother's Alleged Threat to Child

¶ 126   The next asserted corroboration—Mother's purported threat to S.M. to keep the abuse secret—suffers from the same problem. We fully appreciate that "securing the victim's silence and preventing detection is an integral component of any ongoing sexually abusive relationship between an adult and a child." *People v. Boling*, 2014 IL App (4th) 120634, ¶ 91. But the

problem here is that the *proof* of threats to keep quiet, like the proof of abuse itself, comes only from the child. If it comes from the same source, it simply cannot be independent corroboration.

¶ 127                               C. Hypersexualized Conduct with Damian

¶ 128   The State and GAL claim that S.M.'s sexual interactions with Damian constituted "hypersexualized" conduct. We certainly understand that such evidence, under the right circumstances, might be relevant and corroborative of S.M.'s testimony. See *In re T.P.*, 2021 IL App (1st) 210318-U, ¶¶ 88-89 (corroborative evidence included fact that mother saw one child laying on top of another while "moving in a sexual-like manner"). But not here. First, unlike *T.P.*, where the mother testified to the minor victim's overly sexual conduct, in this case all evidence of Damian comes from S.M. So this claim of corroboration suffers from the same problem as the others we have discussed above—it is not *independent* of the child's words.

¶ 129   We could stop there, but a second and independent reason we reject this argument is that, even if we could overlook that the source of this information is the minor himself, we could not make the logical leap that State asks of us in any event, based on the evidence or lack thereof in the record. The relevance of post-incident hypersexual conduct is that the child is acting unnaturally for a child of his or her age, leading to the inference that the respondent's abuse is the reason for that behavior. See *id.* ¶¶ 88-90. But that logical inference would not work here.

¶ 130   We are told from S.M. that at least one of the alleged sexual episodes with Damian *preceded* his alleged encounter with Mother, at least as S.M. related events to Grandmother. Recall that S.M. told Grandmother that Mother was consoling S.M. over a sexual encounter S.M. had with Damian just before she, herself, performed that same sex act on S.M. The State can hardly blame Mother's alleged sexual abuse for prompting a sexual act with Damian that had already happened.

¶ 131   And beyond that one sexual act with Damian, we have absolutely no way of knowing when, timewise, the single instance of sexual abuse attributed to Mother fit in with the (at least) four or five sexual incidents with Damian—we do not know which came before which. So even if we could put aside that S.M.'s allegations of sexual contact with Damian are not *independent* corroboration—and we cannot—we may not presume cause and effect, as the State would have us do, when we have no idea which events came before the others.

¶ 132   We understand that a child will have difficulty pinning down precise dates or times; Grandmother testified here that S.M. was unable to do so. Our point is not to criticize the child. Our point is that, if the State is going to ask us to draw inferences like this one—the fact that S.M. was sexually active with Damian is evidence that he was previously abused by Mother— then we will need, at the barest minimum, evidence that Mother's alleged conduct came before the sexual conduct with Damian. We have no information whatsoever on this point.

¶ 133   Finally, for an entirely different reason, we take issue with the State and GAL characterizing S.M.'s incidents with Damian as evidence of *S.M.'s* hypersexual behavior. As we heard S.M. relate the events in the VSI, he was the *victim* of *Damian's* hypersexuality, the victim of a boy who was two years his senior. S.M. clearly stated that Damian forced acts of anal and oral sex on him against his will. A victim of sexual assault is a victim, full stop. To characterize that victim as a willing, "hypersexual" participant is a bridge we will not cross.

¶ 134                D. Hypersexualized Conduct in Watching Pornography

¶ 135   Next, the State and GAL claim that the fact that S.M. was caught watching pornography in and before August 2023 is evidence of hypersexuality, which could only be explained by his Mother's sexual abuse. We cannot accept this argument for several reasons. For one, the State and GAL conveniently ignore that, according to S.M., S.M. had engaged in at least four or five

sexual episodes with Damian by August 2023. We cannot imagine how the State and GAL could ask us to draw the inference that S.M.'s watching of pornography had *nothing* to do with the four or five instances of sexual contact with Damian and *everything* to do with the single instance of alleged sexual abuse by Mother.

¶ 136    On a related note, we know precious little of the details surrounding S.M.'s watching of pornography. Though there are vague and unsourced references in the DCFS reports, the only substantive evidence put forth at trial on this topic came from Grandmother, on questioning from the GAL:

"Q: [H]ave you ever seen [S.M.] watching porn on an iPad or any device?

A: Well, I just saw him recently, and I spoke with the—with Tyler about it—which is the therapist, and that was the first time I witnessed him watching the porn.

\*\*\*

Q: Has [S.M.] ever told you that he watched porn previously?

A: Yes.

Q: When was that conversation?

A: We had the conversation after I saw him—well, we had the conversation before when everything happened, about watching inappropriate things online, but we just had the—

Q: Let me ask the follow up. When you say after everything happened, are you talking about back in August of 2023?

A: Yes.

Q: Okay. In 2023, you asked him if he was watching porn?

A: Yes.

Q: Okay. And what did he say?

A: He said yes.

Q: Did he say that it was—that he had been recently watching as in that month or the prior month?

A: Yes.

Q: Did he tell you—did he give you any indication as to when he started?

A: No. He just doesn't have a sense of time like not like one week ago, one month ago."

¶ 137    We do not know when S.M. first started watching pornography. From what we can tell, Grandmother asked him about his watching of pornography in August 2023, and he confirmed that he had been watching it for some time before then, starting point unclear.

¶ 138    So we do not know if S.M. started watching pornography before his alleged sexual encounter with Mother or after. Again, we can hardly pin his watching of pornography on Mother's alleged abuse if he was watching pornography before that incident. Nor, as we have already explained, do we have any idea when he started watching pornography relative to when Damian first started molesting him, which we know at least started before the alleged incident with Mother.

¶ 139    And the State made no effort to fill in the details. Grandmother indicated above that she shared her revelation, in August 2023, with S.M.'s therapist. But we did not hear from the therapist at trial. The DCFS investigator, Campbell, confirmed that she learned about S.M. watching pornography from Grandmother somewhere in the same time frame of August 2023, but Campbell testified that she never looked into the allegation or asked S.M. about it.

¶ 140    The long and short is that, if the State expects us to draw an inference that the only reason

S.M. would be watching pornography is that he was molested by Mother, the State has fallen far short of doing so.

¶ 141    We must be clear here: we fully accept that a minor, especially one of S.M.'s tender age, cannot be expected to remember specific dates or even months when the abuse occurred. We have upheld findings of abuse when the minor was unable to be so specific. But that is not the problem here. The problem is that the State must independently corroborate the minor's hearsay allegations, and if it does so by trying to play cause (Mother's abuse) and effect (S.M. watching pornography), we must have *some* evidence in the record that the cause came before the effect.

¶ 142    The State is entitled to reasonable inferences in its favor on appellate review, but that does not include asking us to guess when there is only speculation in the record. And again, the State's theory becomes more tenuous still when we have evidence of another cause—Damian's abuse—happening during the very same time frame and more frequently and beginning, at least, before the Mother is alleged to have engaged in her single act of sexual abuse.

¶ 143    We would add that the State presented no expert testimony linking the watching of pornography with evidence of previous sexual abuse. In closing argument, the GAL argued that S.M. watching pornography "demonstrates that this young boy is hypersexualized and possibly even sexually aggressive which often is indicative of molestation." But that is an opinion if ever we heard one, and no evidence was put on to support that opinion. An expert such as S.M.'s therapist might have been able to testify to that diagnosis, but we fail to see how a layperson could—and the State did not even try to put that evidence in through a layperson. The lawyer simply stated it in closing argument out of whole cloth, as if it were an accepted truth. Attorneys are permitted to argue reasonable inferences in closing argument, but they are not allowed to state expert opinions that have no foundation in the trial record.

¶ 144   On that same note, another thing we don't know, at the risk of being too graphic—these cases are not for the faint-hearted—is what type of pornography S.M. was watching. Was he watching pornography that mirrored the incident of anal sexual abuse he suffered at the hands of Damian? Oral sex like he claimed he experienced with both Damian and Mother? Was it child pornography depicting two children or depicting an adult (perhaps a female) and child? Or adult pornography? Presumably, those details would be of particular interest to an expert in trying to draw a cause-and-effect relationship between a young child's watching of pornography and a specific episode of abuse. All we heard, however, is that S.M. was watching "pornography."

¶ 145   If our discussion reeks of frustration, it should. Far be it for a panel of judges to tell law enforcement how to investigate a claim, but it is obvious enough that law enforcement routinely searches browser histories of computers to learn more about a suspect's use of the computer, including what the individual viewed and when. See, *e.g.*, *People v. Martin*, 2024 IL App (4th) 230124-U, ¶ 20; *United States v. Griffin*, 783 F. App'x 881, 886 (11th Cir. 2019). It would not have been terribly hard for the State to lock down these details before attempting to use evidence of S.M.'s viewing of pornography as corroborative evidence.

¶ 146   As it stands, we do not know when S.M. started watching pornography. And since we are unable to pin down when Mother allegedly abused him or when Damian started molesting him, any possible cause-and-effect inference would be entirely unreasonable to draw. Absent any such tie-up, and absent any expert testimony linking his pornography viewing with sexual abuse committed by Mother (as opposed to Damian's abuse), we cannot find this evidence corroborative in any way of the minor's hearsay accusations of abuse.

¶ 147                           E. Age-Inappropriate Language

¶ 148   Next, the State and GAL claim that S.M.'s use of age-inappropriate language to describe

the abuse is corroborative. For many reasons, we cannot agree with this argument.

¶ 149    The reason why age-inappropriate language makes a child's hearsay allegation more *credible*—not necessarily independently corroborative, but more credible—is obvious enough. There is a straight-line logic to the idea that when a child talks in detailed ways about adult sexual acts, it is "very unlikely, at [their] age, that [a child] could have fabricated these descriptions" if they "had not been taught to do it." *In re Walter B.*, 227 Ill. App. 3d 746, 755 (1992). For example, what semen looks like is not something a child would be expected to describe "unless [they] had seen it, which is unlikely unless the events [the child] described had actually taken place." *K.O.*, 336 Ill. App. 3d at 108.

¶ 150    But even if that inference constituted independent corroboration generally, it certainly does not here. The State would have us accept that S.M.'s use of the phrases "suck" his "thing" and "humping" could only have come from the alleged abuse he suffered at the hands of Mother. The State conveniently ignores that, by August 7, 2023, the date of S.M.'s first outcry, Damian had already performed *that same sexual act* on S.M. at least twice. And S.M. had started watching pornography on an iPad. It is exasperating, to put it mildly, that the State acts if Damian does not exist when it suits its purposes and highlights the pornography only when convenient. And it borders on the frivolous for the State to claim that the only way S.M. would know this vocabulary on August 7, 2023, is due to Mother's alleged abuse.

¶ 151    We would also state, more generally, that we have a difficult time accepting that "age-inappropriate" language could serve as independent corroboration in any event, at least absent expert testimony. Under a plain reading of the statute, S.M.'s description of Mother "sucking" his "thing" and "humping" him is the very statement that requires independent corroboration: a "[p]revious statement[ ] made by the minor relating to any allegations of abuse or neglect." 705

ILCS 405/2-18(4)(c) (West 2024). The very next sentence provides that "*no such statement*, if uncorroborated and not subject to cross-examination, *shall be sufficient in itself* to support a finding of abuse or neglect." *Id.* (emphases added).

¶ 152    Simply put, S.M.'s claim that Mother "sucked" his "thing" and "humped" him *is* the statement of abuse. If we allow that very statement to corroborate itself, we read the second sentence out of the law. We take the "independent" out of "independent evidence." *A.P.*, 179 Ill. 2d at 199. That cannot be the law. That is as circular as circular gets. Evidence that our supreme court says must be "supplementary to that already given" (*id.*) must mean something separate and apart from the child's hearsay statement.

¶ 153    At the risk of over-repetition, the mere fact that evidence makes a proposition more likely true does not mean it is independent evidence. Of course we understand that the more specific a child's hearsay statement is in its description of sexual abuse, the more likely it is credible. It may be persuasive evidence, but it is anything but *independent* evidence.

¶ 154    An analogy to the criminal version of this rule of law is helpful. Section 115-10 of the Code of Criminal Procedure of 1963 exempts out-of-court statements by victims of certain sex crimes from the hearsay rule. 725 ILCS 5/115-10(a) (West 2024). Like the statute before us, section 115-10 imposes safeguards. First, the court conducts a hearing to determine if "the time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b)(1). If the circumstances surrounding the statement make it sufficiently reliable, the victim who made the statement must either testify at the proceeding or, if they are unavailable as a witness, there must be "corroborative evidence of the act which is the subject of the statement" before the statement may be admitted at trial. *Id.* § 115-10(b)(2)(A), (B).

¶ 155    Note the two-step process: the court first requires reliability, *then* requires independent

corroboration (unless the victim testifies). Note further that, in evaluating the statement's

reliability in the first step, we consider such facts "as the child's spontaneous and consistent

repetition of the incident, mental state, *use of terminology unexpected of a child of similar age*,

and lack of motive to fabricate." *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶ 101

(emphasis added); see *People v. Burgund*, 2016 IL App (5th) 130119, ¶¶ 242, 247.

¶ 156    That is consistent with our point—a child's use of age-inappropriate language might

make his or her statement more reliable, but it does not constitute independent corroboration.

¶ 157    The law requires independent corroboration in this context because, quite simply, the law

is reluctant to adjudicate such a monumental allegation, with such monumental consequences, on

the words of a child alone, particularly when that child is not subject to any adversarial

examination at all. A child may be too young to appreciate the difference between fact and

fiction, between reality and fantasy; a child may not appreciate the moral and practical

ramifications of lying; a child may be susceptible to suggestion, even innocent or unintentional

suggestion by an untrained adult or, worse, manipulated into saying something that is untrue (the

principal defense here).

¶ 158    So to help ensure that the child's statement is *not* the product of the child's inability to

differentiate truth from falsity, that an adult did *not* put those words in the child's mouth, we

require something *beyond the child's words*—physical or medical evidence, subsequent actions

of the child indicative of abuse, an eyewitness, medical or psychological testimony from an

expert, testimony from other children attesting to the same abuse.

¶ 159    It is critical that the safeguard of independent corroboration remain fully intact. After all,

given the abhorrent nature of child sex abuse and the understandable reluctance to place children

on the witness stand, the law has already done something that would be unthinkable in any other

context—allowing hearsay evidence as substantive proof. The very least we can do is honor the one guardrail the legislature put in place to at least partially re-balance the scales.

¶ 160   One final point: we question whether laypersons or judges have the expertise to determine what language is age-inappropriate for children. We talk about this evidence as if it were self-evident, but not all children grow up the same or are subject to the same influences and experiences. Not all judges are the same, either. Here, would it be so controversial to say that there are probably some seven-year-olds in this country who are capable of describing oral sex in rudimentary terms, even though they've never been abused—surely not all children of that age, and probably not most, but at least some? Generalizations in this area are dangerous.

¶ 161   As the Missouri Supreme Court noted in rejecting the use of age-inappropriate language as independent corroboration,

"a particular child's verbal skills and word choices are the product of various cultural and social influences, in which parents, siblings, friends, and the entertainment media all play a role. Consequently, the particular words used by a particular child mean little when considering content reliability, since different children, even of the same age, will use different words—depending on their family experiences and their socialization—to describe the same sexual organs or sexual acts." *State v. Redman*, 916 S.W.2d 787, 791 (Mo. 1996).

¶ 162   It would be different, to be sure, if an expert trained in such matters testified, based on an examination of a *particular* child in a *particular* setting, that the use of certain language was inappropriate for *that* child. Expert testimony has routinely been considered independent corroboration. Beyond that, however, we caution against the use of this evidence to serve as independent corroboration in general.

¶ 163   We acknowledge that a number of decisions, cited here by the State and GAL, have found that age-inappropriate language may constitute independent corroboration of a child's hearsay claim of sexual abuse. We respectfully disagree with those decisions on that specific point, but we hasten to add that these decisions did not deeply probe the topic and, in each decision, the age-inappropriate comment was *not* the only independent corroborative evidence. See *Walter B.*, 227 Ill. App. 3d at 754-55 (testimony from caseworker and medical records corroborated that child was physically and sexually abused); *K.O.*, 336 Ill. App. 3d at 108 (child's sexual abuse corroborated by respondent's indictment and conviction for predatory criminal sexual assault, medical assessment, and eyewitness testimony from another child who was also abused); *C.C.*, 224 Ill. App. 3d at 214-15 (corroborating evidence included testimony from child's therapists and "interdisciplinary team" that put together " 'composite picture' " of children and concluded they had been sexually abused); *Alexis H.*, 401 Ill. App. 3d at 561-62 (multiple child victims, some who witnessed abuse against others, corroborated each other, as well as medical testimony noting that eight-year-old girl had open hymen, which doctor considered unusual); *J.L.*, 2016 IL App (1st) 152479, ¶ 92 (multiple statements from child victims who were siblings corroborated each other); *T.P.*, 2021 IL App (1st) 210318-U, ¶ 89 (mother heard and witnessed children playing with each other, with one "moving in a sexual-like manner"); *In re A.R.*, 2023 IL App (1st) 230201-U, ¶¶ 32-33 (medical records and parent's statements provided corroboration); *M.T.*, 2025 IL App (1st) 232134, ¶ 39 (therapist testified that child's behavior was consistent with being sexually abused).

¶ 164   In any event, as we have explained above, even if age-inappropriate language could serve theoretically as independent corroboration, it certainly does not here. The evidence here showed that, by the time that S.M. complained that Mother "sucked" his "thing" and "humped" him,

S.M. had already experienced much the same sexual act, twice at least, at the hands of Damian and had already started viewing pornography. The notion that his vocabulary could only have been learned from Mother's alleged sexual abuse is clearly invalid.

¶ 165                                F. S.M.'s Demeanor in Relating Events

¶ 166   Finally, the State and GAL also focus on S.M.'s demeanor when describing the alleged sexual abuse by Mother. First, they claim that the fact that S.M. was red-faced and crying when he talked to Grandmother about Mother's sexual abuse is corroborative of his claims. One significant problem with this argument is that its premise is incorrect. Recall that the first thing S.M. confessed to Grandmother was not about Mother but Damian; S.M. told her that he had touched Damian's private parts. That spawned this question and answer:

> "Q: What was [S.M.]'s demeanor when you were asking him about touching his friend inappropriately?
>
> A: He was nervous. He was wringing his hands. He was turning red, and he started to cry."

¶ 167   Understandably, S.M. was red-faced and nervous and crying from the outset of this conversation with Grandmother while discussing Damian, before he even got to any talk of Mother. The fact that he didn't *stop* crying as his narrative moved on to Mother does not strike us as "independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred." *A.P.*, 179 Ill. 2d at 199.

¶ 168   The testimony of Berrios was no more compelling. As in every other conversation in which S.M. discussed abuse—whether he told Grandmother, the forensic interviewer, or here Berrios—S.M. began the conversation by stating that *Damian* inappropriately touched him. Berrios testified that, before she broached the topic of body safety—her diplomatic way of

asking about abuse—S.M. had been "really happy. He had a game controller in his hand. He was smiling. He was very interactive just being, like, real cute. And then it transitioned to discomfort." She elaborated that, in terms of body positioning, "[h]e was more, like, closed off. But it was something that, you know, he seemed, to me, relieved. But I can't necessarily say. I'm not a body language expert."

¶ 169   We have trouble finding anything corroborative about the fact that a seven-year-old boy felt uncomfortable discussing matters of intimacy with an adult he had just met. Does this child's discomfort in sharing such personal matters with a complete stranger make it more likely that he was telling the truth versus (as the defense argued) saying something that wasn't true, perhaps at the behest of the paternal side of the family (as the defense also argued)? Frankly, we cannot imagine a scenario in which a seven-year-old would feel anything *but* uncomfortable in this context. It is simply too thin a reed to constitute independent corroboration sufficient to sustain a hearsay allegation of abuse, without more. See, *e.g.*, *In re Marriage of Flannery*, 328 Ill. App. 3d 602, 614 (2002) (relying on *A.P.* to analyze similar statute in marriage-dissolution case: "testimony regarding the physical manifestations that accompany a child's hearsay statements of abuse is insufficient to corroborate the out-of-court statements when the child's conduct is the only corroborative evidence presented").

¶ 170   We note Berrios's self-awareness in stating that she is "not a body language expert." We have credited testimony of experts who have opined about a minor's mannerisms and body language in assessing whether the minor's actions are indicative of abuse. See *M.T.*, 2025 IL App (1st) 232134, ¶ 33 (noting that trial court "specifically focused on Ms. Cifuentes's testimony that M.T.'s 'accounts' and 'body language' were consistent with child abuse and that this was 'based on [Ms. Cifuentes's] experience and dealing with children and her training in

dealing with children' "); *In re Marriage of Gilbert*, 355 Ill. App. 3d 104, 114 (2004) (testimony of assistant director of CAC, police detective, and DCFS investigator, the latter two of whom drew observations from minor's VSI); *In re K.L.M.*, 146 Ill. App. 3d 489, 493 (1986) (psychotherapist testified that minor's behavior during interview "was a sign of abuse").

¶ 171    Here, a number of professionals, from outside the room, observed S.M. during his second VSI to determine whether a basis existed to file a petition for adjudication of wardship, including a police detective. Presumably—hopefully—some of those people had sufficient qualifications to make assessments that S.M.'s statements were credible. And the VSI was videotaped, obviously, something an expert could view later, if not contemporaneously. And that is to say nothing of S.M.'s therapist. The State had every opportunity to present expert testimony as to S.M.'s behavior, demeanor, and the like but, for reasons we cannot understand, did not do so.

¶ 172    Finally, the State and GAL note that the trial judge watched the VSI and found S.M. to be a credible witness. Of course a trial judge should evaluate the minor's testimony at the VSI and make credibility determinations, and we have no doubt the trial judge carefully studied the VSIs, as did we. But we think it would take the law down a dangerous path if this credibility determination could constitute "independent" corroboration.

¶ 173    For one, it should be obvious enough that judging the credibility of a child who relates sexual abuse is not remotely on a par with determining the credibility of a witness who testifies, say, that the traffic light was red versus green, or that it was the defendant and not someone else who robbed the store. There is a reason why so many abuse cases, particularly those lacking physical or medical evidence, rely on expert testimony to probe for nuances in a child's behavior or mannerisms to look for signs of abuse or even veracity. See, *e.g.*, *M.T.*, 2025 IL App (1st) 232134, ¶ 33; *C.C.*, 224 Ill. App. 3d at 214-15; *Gilbert*, 355 Ill. App. 3d at 114; *K.L.M.*, 146 Ill.

App. 3d at 493.

¶ 174   And it is an especially hazardous exercise when the child speaks only at the VSI, where he may be slightly prompted but is never directly challenged; Ms. Arroyo made that very point in describing her role as a forensic interviewer. In any other case where we defer to the credibility judgment of a trial judge, that judge has not only observed the witness on direct examination but on cross-examination. Part of a judge's ability to evaluate a witness's veracity is to see how that witness holds up under adversarial questioning. S.M. was not subjected to adversarial examination—not in the VSI, not ever. (For understandable reasons, but the point remains.)

¶ 175   More fundamentally, if the trial court's credibility judgment on the minor's videotaped interview were enough, by itself, to corroborate the child's hearsay statement, then we are on a path to no longer requiring independent corroboration. As we discussed at some length in the previous section, the child's testimony at the VSI *was* the hearsay allegation of abuse that formed the basis of the charge here. If all it takes to "corroborate" that hearsay statement, which in this case happened on video, is to find that the minor seemed credible when making it, then the requirement that the State provide evidence "supplementary to that already given" (*A.P.*, 179 Ill. 2d at 199) goes out the window.

¶ 176   We are not saying the trial judge should not make a credibility evaluation of the minor's videotaped statement. Of course she should. Nor are we criticizing the evaluation this judge made. But we disagree that this evaluation can constitute *independent* corroboration, not without the testimony of experts qualified in their particular field to make these observations.

¶ 177   We end where we started: We are not saying that we do not believe this child. We are saying that the law forbids us from upholding a finding of sexual abuse on the hearsay statement of a child alone. And here, that is all we have. To our surprise and frustration, though the State

knew all along that it lacked physical or medical evidence of abuse, that it lacked the testimony of eyewitnesses or other victims, and that it had the added complication of a second alleged abuser—in other words, that its case rested solely on the words of this child—the State put on a case void of expert testimony, void of certain details it likely could have filled in, and left this case with no independent corroboration of S.M.'s hearsay statements.

¶ 178   The finding of sexual abuse is reversed.

¶ 179                    II. Remaining Abuse and Neglect Charges

¶ 180   Having found that the State did not meet its burden on the sexual-abuse claim, we are left with the allegations that Mother neglected S.M. by exposing him to an injurious environment and was abusive based on a substantial risk of injury in that environment. These claims stem from S.M.'s statement in the first forensic interview that Mother was with a partner who once physically battered her.

¶ 181   If nothing else, we can say that the State independently corroborated that claim. Recall that Grandmother testified that, in September 2022, Mother reached out to her and asked if she could stay with Grandmother for a while. Mother told her she was afraid of her boyfriend and feared for her safety. Mother eventually came over to Grandmother's house with S.M. and told her that her then-paramour, Travaughn, had punched her so hard in the face that she thought she broke her nose. Grandmother also said that she saw marks and bruises on Mother's face and body, and that Mother said that Travaughn caused the injuries.

¶ 182   Mother argues that evidence of one incident of domestic violence, after which she quickly left the house and sought safety, is hardly proof of abuse or neglect. She worries that a mother who is a victim of domestic violence even once runs the risk of having her child taken away from her, even when she leaves the abusive party. For their part, both the State and GAL

argue that the trial court's findings were not manifestly erroneous.

¶ 183   There is no question that the sexual-abuse charge dominated this case, the remaining charges concerning domestic battery an afterthought at best. Grandmother's testimony was the only evidence at trial, with S.M.'s statement in the first VSI playing off-camera. The judge's findings on the record reflected as much, mentioning the domestic violence only in passing.

¶ 184   The law requires the trial court, in finding abuse or neglect, to explain the factual basis supporting that finding and specify what acts or omissions formed the basis of the court's findings. 705 ILCS 405/2-21(1) (West 2024). This helps the parents know what they did wrong and gives a reviewing court something to review. *In re Madison H.*, 215 Ill. 2d 364, 374 (2005). That did not happen here.

¶ 185   Given the lack of factual findings and the obvious dominance of the charge we have now reversed, the best course is to vacate the court's other findings of abuse and neglect and remand to the trial court for further consideration of those charges. Whether the trial court will simply explain its findings and re-enter judgment, whether the trial court will reconsider that judgment, or whether the trial court will decide to reopen the proofs, are for the trial court to decide.

¶ 186   And because we have now either reversed or vacated each of the charges, we must also vacate the court's judgment at the disposition hearing that followed the adjudication hearing.

¶ 187                                          CONCLUSION

¶ 188   The judgment of the circuit court is reversed insofar as the court found that Mother sexually abused S.M. The court's remaining judgment at the adjudication hearing is vacated. The judgment of the circuit court at the disposition hearing is vacated. The cause is remanded for further proceedings.

¶ 189   Reversed in part; vacated in part; cause remanded.

***In re S.M.*, 2026 IL App (1st) 250340**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 23-JA-722; the Hon. Lisa M. Taylor, Judge, presiding. |
| **Attorneys for Appellant:** | Marv Raidbard, of Skokie, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Kass A. Plain, Carrie Fung, Maria A. Petrone, of the Office of the Cook County Public Guardian, of Chicago, for the minor. |